In re **SACRED HEART HOSPITAL OF NORRISTOWN, etc., Debtor.**

**SACRED HEART HOSPITAL OF NORRISTOWN, etc., Plaintiff/Appellant,**

v.

**COMMONWEALTH OF PENNSYLVANIA, DEPARTMENT OF LABOR AND INDUSTRY, Defendant/Appellee.**

Civil Action Nos. 96–0491, 96–6623.

United States District Court, E.D. Pennsylvania.

June 10, 1997.

Vincent J. Marriott, III, Philadelphia, PA, for Plaintiff/Appellant.

Susan N. Duke, Harrisburg, PA, for Defendant/Appellee.

## MEMORANDUM & ORDER

DITTER, District Judge.

In this bankruptcy appeal, I must decide whether payments due from a nonprofit employer to Pennsylvania's Unemployment Compensation Fund ("fund") as reimbursement for benefits paid by the fund to the employer's former employees are "excise taxes" entitled to priority treatment under the federal bankruptcy code. For the reasons that follow, I conclude that the payments are entitled to such treatment. Accordingly, I will affirm the bankruptcy court.

## I.

The debtor, the Sacred Heart Hospital of Norristown, Inc., and the creditor, the Commonwealth of Pennsylvania, Department of Labor and Industry ("DLI"), stipulated to the following facts in the bankruptcy court. (See Tr. Nov. 11, 1995, at 5–9 (Record of Appeal No. 96–0491, Ex. 7)). Sacred Heart operated an acute-care, not-for-profit hospital in suburban Philadelphia until May, 1994. DLI is the Pennsylvania state agency responsible for administering the fund and collecting contributions. It accomplishes this function through its Bureau of Employer Tax Operation. On May 18, 1994, Sacred Heart ceased its operations and laid off substantially all of its several hundred employees. One week later it filed a chapter 11 bankruptcy petition. See 11 U.S.C. §§ 1101–74 (1996) (codification of chapter 11).

Because it employed persons in Pennsylvania, Sacred Heart was subject to the state's Unemployment Compensation Law, 43 P.S. §§ 751–914 (1992). See 43 P.S. §§ 753(j)(1), (l)(1) (defining covered "employer" and "employment," respectively). Under this law, employers are required to make contributions to the fund which in turn compensates unemployed workers who have lost their jobs through "no fault of their own." 43 P.S. § 752. One of the purposes of the fund is to spread the risk of involuntary unemployment among many employers. See id. ("sharing of risks, and the payment of compensation with respect to unemployment meets the need of protection against the hazards of unemployment and indigency").

Generally, employers covered by the law must make the contributions quarterly in an amount equal to a statutorily mandated percentage of the wages paid to their employees. 43 P.S. § 781. The contributions paid to the fund are kept separate from Pennsylvania's general revenues. 43 P.S. § 841. The fund then makes unemployment compensation payments directly to eligible, discharged employees. See 43 P.S. § 801.

Upon a proper election, a nonprofit employer, such as Sacred Heart, may forgo making the quarterly wage-based contributions and instead may reimburse the fund for payments the fund makes directly to the employer's discharged workers. 43 P.S. § 904(a).[1] The law defines the electing nonprofit employer's "payments in lieu of contributions" as "contributions." 43 P.S. § 753(g). Sacred Heart made a proper election. (See Tr. of Nov. 11, 1995, at 9). An employer who makes an election must execute a surety bond or deposit with DLI money or securities equal to a portion of wages paid. 43 P.S. § 906(d). The law does not allow employers to obtain private insurance to cover their obligation to the fund and an at-will employee in Pennsylvania generally has no cause of action against his employer for his discharge. See Phillips v. Babcock & Wilcox, 349 Pa.Super. 351, 503 A.2d 36, 37 (1986).

As one would predict, Sacred Heart's closing and filing for bankruptcy protection in May, 1994, caused many of its laid-off employees to file for unemployment compensation. The fund made payments to the eligible former employees. However, due to Sacred Heart's financial troubles, the hospital failed to reimburse the fund for the amounts paid by the fund and DLI filed a proof of claim for approximately $7.2 mil-

---

**1.** Section 904(a) provides:

Any nonprofit organization which, on or after January 1, 1972, is or becomes liable to the contribution provisions of this act may, in lieu of payment of such contributions, elect to pay to the department for the Unemployment Compensation Fund an amount equal to the amount of regular benefits paid, that is attributable to service in the employ of such nonprofit organization.

lion, asserting that it was entitled to priority over other unsecured creditors because the payments in lieu of contributions due from Sacred Heart were "taxes" within the meaning of 11 U.S.C. § 507(a)(7)–(E).[2] (*See* Record in Appeal No. 96–0491, Ex. 5 at 1 (DLI's proof of claim)). There is no dispute that DLI's claim is unsecured. The hospital objected to both the amount of the claim and the assertion of priority. Following mediation, the parties agreed that the amount due the fund was approximately $2.5 million. After a hearing and briefing, in an order dated December 20, 1995, the bankruptcy court rejected Sacred Heart's remaining objection, concluding that payments in lieu of contributions due from the hospital were entitled to priority as "excise taxes" under § 507(a)(7)(E), and entered final judgment for DLI. *See In re Sacred Heart Hosp. of Norristown*, 190 B.R. 38, 44 (Bankr.E.D.Pa.1995).

There is another claim involved here. Sacred Heart made two pre-bankruptcy payments in lieu of contributions to DLI. On February 21, 1994, Sacred Heart paid DLI $22,305.51 and $24,414.42 on April 28, 1994. (*See* Record in Appeal No. 96–6623, Ex. 7 ¶¶ 4–6). After filing for bankruptcy protection, the hospital filed an adversary action against DLI seeking to avoid these payments as preferential transfers. *See* 11 U.S.C. § 547(b). Under § 547, a bankruptcy estate, through its trustee, may avoid a transfer by the debtor to a creditor if the transfer is in payment of an antecedent debt owed by the debtor prior to the transfer; was made while the debtor was insolvent; occurred within 90 days of the filing of the petition; and enabled the creditor to receive more than it would if the case was filed as a liquidation pursuant to

Chapter 7 of the bankruptcy code. 11 U.S.C. § 547(b).

The parties stipulated that these payments by Sacred Heart to DLI were made within 90 days of Sacred Heart's filing its bankruptcy petition. (Record in Appeal No. 96–6623, Ex. 7 ¶¶ 5(a), 6(a)). Based on the parties' stipulation, the bankruptcy court's decision that DLI's $2.5 million claim was entitled to priority, and the fact that the plan for the hospital's liquidation provided full payment to all priority creditors, the bankruptcy court dismissed Sacred Heart's adversary complaint. (Record in Appeal No. 96–6623, Ex. 2). The court found that DLI would receive the same amount in Sacred Heart's bankruptcy as DLI would receive if the hospital had filed a petition under Chapter 7. (*Id.* at 2). Accordingly, in an order dated August 20, 1996, the bankruptcy court entered final judgment against Sacred Heart. The hospital appealed. I consolidated this appeal with the hospital's appeal of the bankruptcy court's decision in DLI's $2.5 million claim.

## II.

■ I have jurisdiction of these appeals because in them Sacred Heart seeks reversal of two final judgments of the bankruptcy court. *See* 28 U.S.C. § 158(a)(1) (1996). Because the appeals involve a purely legal issue, namely whether the moneys owed to the fund by Sacred Heart are entitled to priority in bankruptcy, I exercise plenary review. *In re C.S. Assocs.*, 29 F.3d 903, 905 (3d Cir.1994).

## III.

■ Section 507 (a)(7)(E)[3] provides that "excise taxes" have priority over claims made

---

2. In the bankruptcy court, § 507(a)(7)(E) applied. However, a 1994 amendment to the bankruptcy code resulted in § 507(a)(7)(E) being renumbered. The identical text now appears at § 507(a)(8)(E). That amendment did not apply to cases pending before the bankruptcy court at the time the amendment took effect on October 22, 1994. *See* Pub.L. 103–394, § 702, 108 Stat. 4106, 4150 (1994). Accordingly, because this case was pending before the bankruptcy court on October 22, 1994, in this opinion I will refer to § 507(a)(7)(E) as the applicable code section.

3. Section 507(a)(7)(E) provides:

(a) The following expenses and claims have priority in the following order:

\* \* \*

(7) Seventh, allowed unsecured claims of governmental units, only to the extent that such claims are for—

\* \* \*

(E) an excise tax on—
(i) a transaction occurring before the date of the filing of the petition for which a return, if required, is last due, under applicable law or under any extension, after three years before the date of the filing of the petition; or

on a bankruptcy estate by other specified unsecured creditors. The term "tax" is not specifically defined in the bankruptcy code. The definition of a tax for bankruptcy priority purposes is found exclusively in the federal case law, although in the case of a claim by a state government for a charge or obligation created by state law, the state law determines the attributes of the government's claim. *City of New York v. Feiring,* 313 U.S. 283, 285, 61 S.Ct. 1028, 1029, 85 L.Ed. 1333 (1941).[4] Therefore, the proper analysis is to determine whether the attributes of the government's claim as provided by state law fit the definition of a tax articulated by the federal courts construing federal law.

The United States Supreme Court defines a tax as a "pecuniary burden[ ] laid upon individuals or their property, regardless of their consent, for the purpose of defraying the expenses of government or of undertakings authorized by it." *Id.; see also New Jersey v. Anderson,* 203 U.S. 483, 492, 27 S.Ct. 137, 140, 51 L.Ed. 284 (1906). Circuit and district courts have employed tests that are semantically slightly different from but substantively identical to the Supreme Court's test. For example, the United States Court of Appeals for the Ninth Circuit adopted a four-part test. According to it, in order to be a tax, the government claim must be: (a) an involuntary pecuniary burden, regardless of name, imposed on individuals or property; (b) by or under authority of the legislature; (c) for public purposes, including the purposes of defraying expenses of government or undertakings authorized by it; and (d) under the police or taxing power. *In re Lorber Indus. of California,* 675 F.2d 1062, 1066 (9th Cir.1982); *see also In re Adams,* 40 B.R. 545, 547 (E.D.Pa.1984)

(Giles, J.) (drawing distinction between contractual obligation to state and a tax which is an involuntary charge assessed on all). In *In re Suburban Motor Freight, Inc.,* 36 F.3d 484 (6th Cir.1994) ("*Suburban II* "), the Sixth Circuit employed two additional factors that refine the "public purpose" prong of this test: (1) that the pecuniary obligation to the government be universally applicable to similarly situated entities; and (2) that according priority treatment to the government's claim not disadvantage private creditors with like claims. *Id.* at 488.[5]

■ Taxes receive priority in bankruptcy for several reasons. First, Congress has determined that taxes are in many ways more important than the debts owed to individual creditors. Taxes benefit the public while ordinary debt payments benefit only the creditor and possibly those individuals closely associated with the creditor. *See In re Wm. Akers, Jr. Co.,* 121 F.2d 846, 848 (3d Cir. 1941) (taxes are used to "sustain the public burdens, and discharge the public debts"). Of course, I recognize that all moneys collected by the government—including those which are not taxes—are purportedly used for some public purpose. However, a government's claim looks less like a tax and more like a commercial charge when it involves a fee in exchange for the privilege of engaging in a certain regulated activity not available to the public generally or for the provision of a service which a person may obtain lawfully from others or may provide himself. *See National Cable Television Ass'n, Inc. v. United States,* 415 U.S. 336, 340–41, 94 S.Ct. 1146, 1148–49, 39 L.Ed.2d 370 (1974); *Suburban II,* 36 F.3d at 489. In the latter situation, the government occupies the same position as an ordinary creditor and

(ii) if a return is not required, a transaction occurring during the three years immediately preceding the date of the filing of the petition.

4. The Court in *Feiring* construed a provision of an earlier version of the federal bankruptcy law. 313 U.S. at 284, 61 S.Ct. at 1028–29. Nonetheless, both the Supreme Court and several circuit courts have employed the definition of "tax" articulated in *Feiring* when construing the present version of the bankruptcy law. *See, e.g., United States v. Reorganized CF & I Fabricators of Utah, Inc.,* —— U.S. ——, ——, 116 S.Ct. 2106, 2113, 135 L.Ed.2d 506 (1996); *In re Suburban*

*Motor Freight, Inc.,* 998 F.2d 338, 339 n. 2 (6th Cir.1993) ("*Suburban I* "); *New Neighborhoods, Inc. v. West Va. Workers' Compensation Fund,* 886 F.2d 714, 718 (4th Cir.1989).

5. In *In re Camilli,* 94 F.3d 1330 (9th Cir.1996), the United States Court of Appeals for the Ninth Circuit employed both the *Lorber* factors and those articulated in the two *In re Suburban Freight, Inc.* decisions in deciding that payments due a state workmen's compensation fund are entitled to tax priority. *Camilli,* 94 F.3d at 1333–34.

the claim's public purpose characteristics are less prevalent. 36 F.3d at 488. Congress recognized this distinction. It did not give priority to all government claims, but only to certain ones specifically listed in the bankruptcy code. *See* 11 U.S.C. § 507(a) (exhaustive list of priority claims not including debts to government for services provided or licensing fees). *But see Williams v. Motley,* 925 F.2d 741, 743 (4th Cir.1991) (fee paid to state for privilege of self insuring automobile is tax).

Second, Congress gave taxes priority in bankruptcy because a state, local, or federal taxing authority is an involuntary creditor of the debtor. It cannot choose its debtors, nor can it generally take security in advance of the time that the taxes become due. Other creditors may do so. The taxing authority is given an advantage in the form of priority over other creditors in order to compensate for this disadvantage in relation to other creditors. *See* H.R.Rep. No. 95–598, at 190 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6150.

Finally, while less relevant to this case than the other two reasons, priority is given to protect the integrity of the tax system. The perception by taxpayers that the tax system is fair is critical to efficient tax collection. This perception will be damaged if the public believes that taxpayers are improperly using bankruptcy laws to avoid paying taxes. "To the extent that debtors in bankruptcy are freed from paying their tax liabilities the burden of making up the revenues thus lost must be shifted to other taxpayers." S.Rep. No. 95–989, at 14 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787, 5800. Hence, giving taxes priority will cause more money to be paid to taxing authorities, leave less of a shortfall to be borne by other taxpayers, and further the perception of fairness.

■ Both the Supreme Court's opinion and subsequent decisions by lower courts predominantly focus on two aspects of the definition of a tax: involuntariness, i.e. that the charge is imposed regardless of the consent of the individual, *see Feiring,* 313 U.S. at 285, 61 S.Ct. at 1029, and the public purpose prong. *See Reorganized CF & I,* —— U.S. at ——, 116 S.Ct. at 2113. Attention to the involuntariness prong insures that taxes will be treated differently from the other obligations to governmental units assumed by individuals voluntarily.[6] The bankruptcy system is designed to distribute the estate as equally as possible among similarly situated creditors. *See, e.g., Begier v. I.R.S.,* 496 U.S. 53, 58, 110 S.Ct. 2258, 2262–63, 110 L.Ed.2d 46 (1990); *Suburban II,* 36 F.3d at 487; *In re Metro Transp. Co.,* 117 B.R. 143, 154 (Bankr.E.D.Pa.1990). Allowing a governmental unit to receive more for a claim that is the same or substantially similar to the estate's obligation to a private creditor would violate this policy. *See In re Suburban Motor Freight, Inc.,* 998 F.2d 338, 341 (6th Cir.1993) (*"Suburban I"*). Focus on the public purpose prong assures that the amounts sought in the claim provide support for the government generally and not for a small group or an individual.

■ Sacred Heart argues that payments in lieu of contributions under Pennsylvania's Unemployment Compensation Law do not have the attributes of a tax. The hospital contends that the payments are "voluntary." *See Feiring,* 313 U.S. at 285, 61 S.Ct. at 1029 (key attribute of tax is that it is imposed "without individual's consent"). According to Sacred Heart, an electing nonprofit employer never is required to pay money to the fund unless it voluntarily elects to discharge a covered employee. Furthermore, payments in lieu of contributions are also unlike taxes and more like self insurance or debt repayment, the hospital claims, because the employer only owes exactly what the fund pays out. (Sacred Heart's br. at 3). Citing *In re Metro Transp. Co.,* 117 B.R. 143 (Bankr. E.D.Pa.1990), Sacred Heart compares payments in lieu of contributions under Pennsyl-

---

**6.** Governments also impose "penalties" upon their citizens. Penalties bear several of the attributes of taxes, including the fact that they are involuntarily imposed. Unlike taxes, however, they are generally levied to punish and not to raise revenues. This is not at issue in this case because neither party argues that Sacred Heart's payments in lieu of contributions are penalties. *See* 11 U.S.C. § 507(a)(8)(G) (Supp.1997) (giving priority to penalty imposed for failing to pay priority tax and which is to compensate for state's actual pecuniary loss).

vania's unemployment compensation system to premiums paid to a state-run fund in a worker's compensation system which allows employers to discharge their duty to injured workers either through self insurance, by participating in a state-run fund, or by obtaining insurance from a private provider. Sacred Heart further maintains that the payments are not taxes because the money collected by the fund is not used to defray general government expenses and is not imposed on the public generally. Rather, according to the hospital, the funds collected are kept separate from Pennsylvania's general tax revenues, used only to benefit a small part of the state's population, involuntarily unemployed workers, and only imposed on a small part of the population, nonprofit employers who discharge workers.

DLI responds that payments in lieu of contributions have the attributes of a tax. The payments are involuntary; employers may not obtain private insurance to cover their obligation, there is no true self-insurance option because all payments must be made to the fund—even payments in lieu of contributions—and all employers must participate. Furthermore, according to DLI, even though the money collected by the fund is kept separate from general revenues, it is used to benefit the public generally because unemployment compensation payments to workers prevent poverty which benefits all citizens not just unemployed workers. Finally, DLI argues, no private creditor has a claim substantially similar to the government's because there is no private or self-insurance option.

■ I agree with DLI. Payments in lieu of contributions are excise taxes and entitled to

priority in bankruptcy. First, without a doubt, the payments are "involuntary." See 43 P.S. § 781(a)(1) ("[e]ach employer shall pay contributions ...") (emphasis added). Simply stated, all employers—for-profit and nonprofit—must pay them. The fact that a voluntary act must be undertaken in order to trigger imposition of the tax upon an employer is not determinative. An argument similar to Sacred Heart's could be made with respect to the federal or state income tax systems and establishes the dubiousness of the hospital's argument; an individual is only required to pay income taxes if he voluntarily elects to earn income. Second, the payments are used to benefit the public generally because compensating unemployed workers reduces the chances of their becoming poor and making demands on the federal and state welfare systems and thus all taxpayers. *United States v. State of New York*, 315 U.S. 510, 517, 62 S.Ct. 712, 715–16, 86 L.Ed. 998 (1942); *New Neighborhoods*, 886 F.2d at 719.[7] Third, Pennsylvania's law meets the other parts of the Ninth Circuit test: there is no dispute that the law was enacted by the state legislature pursuant to the government's police power. See 43 P.S. § 752. Finally, the law satisfies the two "public purpose" factors articulated by the Sixth Circuit in *Suburban II*. The obligation is universally imposed on all employers. See 43 P.S. §§ 753(j)(1), (*l*)(1), 781(a)(1). Further, because there is no private or self-insurance options in Pennsylvania's unemployment compensation system, there are no private creditors with claims sufficiently similar to the state's to violate the bankruptcy policy of equal distribution.[8]

---

**7.** *See also In re Leckie Smokeless Coal Co.*, 99 F.3d 573, 583 (4th Cir.1996) (obligation imposed to "restor[e] financial stability to coal miner's benefit plans" meets public purpose prong).

**8.** Sacred Heart points out that a nonprofit employer which elects to reimburse the fund must post a surety bond. See 43 P.S. § 906(d). According to Sacred Heart, if the employer fails to make the payments and the bond is called on to satisfy the employer's obligation, a private creditor, the bondholder, will have a claim similar to DLI's. While this factor cuts in Sacred Heart's favor, it is not dispositive given the other tax-like attributes of payments in lieu of contributions.

*See Suburban II*, 36 F.3d at 489 (whether there are similarly situated private creditors is a "concern" and not a dispositive factor). Further, despite the court's reasoning in *Suburban II*, the holder of a surety bond has a different claim than a private insurance company that competes with the state to provide worker's compensation insurance. The private insurer's claim is identical to the state's while the bondholder in Pennsylvania's system is contingent on the employer's default, may never be called upon by the state, and the liability created by it may vary with the amount obtained in bankruptcy.

In reaching this conclusion, I reject Sacred Heart's comparison of unemployment compensation payments to worker's compensation premiums. Several courts have considered whether worker's compensation premiums owed to a state-run fund are taxes for bankruptcy priority purposes. *See, e.g., Suburban I*, 998 F.2d at 339; *Metro Transp.*, 117 B.R. at 144. However, apparently no district or circuit court has considered whether unemployment compensation fund contributions in the form of payments in lieu of contributions are taxes, although the Third Circuit has held that direct contributions to the fund by a for-profit company were "taxes" for bankruptcy priority purposes. *Akers*, 121 F.2d at 851. Sacred Heart argues that *Akers* is distinguishable because that case dealt with direct contributions to the fund and not the payments in lieu of contributions at issue here.

■ It is clear that worker's compensation fund premiums are not taxes when the state law allows employers to meet their obligation under state law by one of three options: subscribing to the state-run fund, obtaining private insurance, or self insuring. *Metro Transp.*, 117 B.R. at 154. In such a situation, the payments to the state fund are not "mandatory" and the system is not "monopolistic" because covered employers are allowed to obtain insurance elsewhere, either with a private carrier or through self insurance. Further, in that system, worker's compensation payments appear more like insurance premiums and less like taxes because the worker's compensation system regulates an employers' common-law liability for injured workers. That liability would exist in the absence of the worker's compensation system. In contrast, in Pennsylvania, an employer generally has no common-law liability for unemployment compensation. *Phillips*, 503 A.2d at 37. Hence, this is not an obligation that is generally specifically insured against.

However, a worker's compensation obligation is similar to unemployment compensation fund contributions in at least one way. They both have an involuntariness aspect because states generally require employers' participation in the worker's compensation

system, even if it is through private or self insurance. *See, e.g.,* Ohio Const. art II, § 35; Ohio Rev.Code Ann. § 4123.01(B) (Banks–Baldwin 1996); W. Va.Code § 23–2–1(a) (1996). Nonetheless, Pennsylvania's unemployment compensation system is critically different from such a nonmonopolistic worker's compensation system. Those differences establish that unemployment compensation payments in lieu of contributions under Pennsylvania law are taxes. As explained above, unlike the permissive worker's compensation system, Pennsylvania's unemployment compensation law is monopolistic. Pennsylvania "monopolizes" the unemployment compensation system because only payments to the state's fund discharge the employer's obligation. Private insurance is not allowed and there is no true "self-insurance" option because the employer may never pay benefits directly to its former employees but must reimburse the fund for payments the fund makes to the former employers. Self insurance is never even mentioned in the unemployment compensation law, despite its reference in other state laws. *See, e.g.,* 42 Pa.C.S.A. § 8559; 40 P.S. § 1301.701; 75 Pa.C.S.A. § 1787.

The case law on worker's compensation premiums supports my conclusion. In *Suburban I,* the Sixth Circuit held that contributions to Ohio's worker's compensation fund required of all employers were taxes entitled to priority in bankruptcy. The court found persuasive the fact that there was no private insurance option and that all employers must participate in the system either by contributing to the fund or by self insuring against claims. *Id.* at 341–42. The lack of a self-insurance option in Pennsylvania's unemployment compensation system makes the instant case even more compelling because it is more "monopolistic" than Ohio's worker's compensation system. Similarly, in *New Neighborhoods,* the Fourth Circuit found West Virginia's similar workman's compensation system to impose a tax. The charge was involuntary because all employers must participate in the system either through subscription to the state-run fund or through self insurance. Further, the funds collected served the public purpose of spreading the risk of involuntary unemployment among all

658

the state's employers. 886 F.2d at 719. The court recognized as critical the fact that there was no private insurance option available to employers and, as a result, the state would not be in the same position as any private party.

Sacred Heart relies heavily on *Suburban II*. That case is distinguishable. There, the Sixth Circuit affirmed the denial of priority status to a claim by the Ohio state worker's compensation fund. The employer had failed to pay premiums when it participated in the state-run fund and make payments directly to its injured employees while the employer was lawfully self insured. While the employer was self insured it was required to and obtained a bond from a private insurer to protect the fund against a possible default. Even though the employer defaulted, the employees were paid worker's compensation by the state-run fund. The fund sought to recover both the past due premiums and the actual payments made to workers. In denying priority status, the court relied on two factors articulated in *Suburban I:* that a government charge is only a tax if the burden is universally applicable to all similarly situated entities and that giving priority treatment to the government's claim does not disadvantage private creditors with similar claims. The obligation to the government relating to the premiums owed when the employer participated in the state-run fund failed the first prong because only defaulting employers—not all employers—were required to pay both premiums and repayments. The part of the obligation incurred while the employer was self insured failed the second prong because a private creditor, the party holding the bond, had the same claim as the government and would be disadvantaged if the government claim received priority. *Id.* at 489. Sacred Heart is in a different position than the employer in *Suburban II*. First, the government claim against Sacred Heart arises out of an obligation that is imposed on all employers, hence it is universally imposed on all similarly situated entities. Second, even though both the Ohio worker's compensation system and the Pennsylvania unemployment compensation law share the requirement that certain employers execute a bond or post

money or securities to guarantee payments, the other tax-like attributes of the Pennsylvania system outweigh this single non-tax characteristic.

## IV.

In sum, I conclude that payments in lieu of contributions are taxes entitled to priority treatment under 11 U.S.C. § 507(a)(7)(E). Accordingly, I will affirm the December 20, 1995, and August 20, 1996, orders of the bankruptcy court.