**In re SACRED HEART HOSPITAL OF NORRISTOWN, etc., Appellee/Debtor.**

**Civil Action No. 95–5930.**

United States District Court, E.D. Pennsylvania.

Aug. 7, 1997.

Vincent J. Marriott, III, Philadelphia, PA, for Plaintiff.

Susan N. Dukes, Harrisburg, PA, for Defendant.

## MEMORANDUM & ORDER

DITTER, Senior District Judge.

In this case, I must decide whether payments due to three Pennsylvania workmen's compensation funds must be given priority in bankruptcy. The bankruptcy court held that the payments should not receive priority. For the reasons that follow, I conclude that the bankruptcy court erred and will reverse.

## I. THE FACTS

The facts are not in dispute. The debtor/appellee, the Sacred Heart Hospital of Norristown ("Sacred Heart" or the "hospital"), operated a not-for-profit hospital in suburban Philadelphia for many years until it closed in May, 1994. At that time, due to financial difficulties, the hospital ceased operations and filed a bankruptcy petition pursuant to Chapter 11 of the federal bankruptcy law. See 11 U.S.C. §§ 1101–74. When it closed, the hospital owed a total of $2,314 to

three Pennsylvania workmen's compensation system funds, the Self–Insurance Guaranty Fund, the Supersedeas Fund, and the Subsequent Injury Fund. (*See* R. on Appeal, Ex. 5 at 1).

The claimant/appellant, Commonwealth of Pennsylvania Department of Labor and Industry, Bureau of Workmen's Compensation ("DLI"), is responsible for collecting the payments due and administering the state's workmen's compensation system, including these three funds.

### A. *The Procedural History in the Bankruptcy Court.*

On December 19, 1994, DLI filed a proof of claim seeking payment of the $2,314 owed by Sacred Heart. (Ex. 5). Specifically, DLI claimed Sacred Heart owed $1,048 to the Self–Insurance Guaranty Fund, (*id.* ¶ 3), and a total of $1,266 to the Supersedeas and Subsequent Injury Funds. (*Id.* ¶ 4). DLI also asserted that the money was entitled to priority payment pursuant to 11 U.S.C. § 507(a)(7) because the amounts due were "taxes." (Ex. 5 at 1). DLI did not specify which type of tax it claimed the payments to be. Sacred Heart did not object to the amount claimed or argue that it was not owed, but instead contested the claims' priority classification. (Ex. 6 ¶ 7). In its response to Sacred Heart's objection, DLI asserted that the $2,314 was an "excise tax" within the meaning of 11 U.S.C. § 507(a)(7)(E).[1] (Ex. 7 ¶ 15). The hospital responded that the amounts due to the funds were not taxes but more like insurance premiums voluntarily paid to the three state funds in exchange for insurance coverage and should be paid in the same manner as Sacred Heart's other general unsecured creditors. (*See* Ex. 9 at 3).

After briefing by the parties, in an order dated August 15, 1995, the bankruptcy court concluded that the amounts owed the three funds were not taxes and classified DLI's claim as general, unsecured, and not entitled to priority. (*See* Ex. 2). DLI appealed the court's order.

### B. *Pennsylvania's Workmen's Compensation System.*

Resolution of this appeal requires a brief description of Pennsylvania's workmen's compensation system and statutory scheme. Like a typical state workmen's compensation system, Pennsylvania's statutory scheme replaced a common-law system in which an employee injured or killed while working could sue his employer in order to obtain compensation for his injuries.[2] Obviously, in the case of a deceased employee, the employee's estate would file the lawsuit against the employer. In the old common-law system, the employee was no different than any personal-injury plaintiff—he had to show fault on the part of his employer in order to collect and overcome the common-law defenses available to the employer.

The workmen's compensation system changed all that. Now, with some exceptions, an injured employee automatically receives compensation from his employer (or his employer's insurer) without regard to the employer's fault so long as the employee was injured "in the course of his employment." 77 P.S. §§ 411(1), 431; *see generally* Edward J. O'Connell Jr., *Intentional Employer Misconduct and Pennsylvania's Exclusive Remedy Rule After Poyser v. Newman & Co.: A Proposal for Legislative Reform,* 49 U. Pitt. L.Rev. 1127, 1131–33 (1988) (discussing history and policy of Pennsylvania's workmen's compensation system). In lieu of filing suit, the injured employee serves notice to his employer that he has been injured on the job. 77 P.S. §§ 631–33. If the employer or its insurer does not dispute the claim, it is paid in an amount established by statute.

---

1. In the bankruptcy court, § 507(a)(7)(E) applied. However, a 1994 amendment to the bankruptcy code resulted in § 507(a)(7)(E) being renumbered. The identical text now appears at § 507(a)(8)(E). That amendment did not apply to cases pending before the bankruptcy court at the time the amendment took effect on October 22, 1994. *See* Pub.L. 103–394, § 702, 108 Stat. 4106, 4150 (1994). Accordingly, because this case was pending before the bankruptcy court on October 22, 1994, in this opinion I will refer to § 507(a)(7)(E) as the applicable code section.

2. The Pennsylvania Constitution authorized the state legislature to enact the workmen's compensation system. *See* Pa. Const., Art. 3, § 18.

*See* 77 P.S. §§ 511–14, 531, 541–42, 561–62, 581, 583 (Supp.1997). In the case of a dispute between the employer or its insurer and the employee, initially an administrative referee—not a court—will decide the dispute. In this system, both the employer and employee have given up certain rights in exchange for others. Employers are no longer liable in tort for injuries suffered by employees, but they have given up the common-law defenses of the fellow-servant rule, contributory negligence, and assumption of the risk. *See* 77 P.S. §§ 41(a)–(c), 51. Employees are now assured of a certain and automatic recovery for their injuries without having to prove their employers' fault. In exchange, employees have given up their right to sue employers for compensation. *See generally Wagner v. National Indem. Co.,* 492 Pa. 154, 422 A.2d 1061, 1065 (1980).

As an employer with employees in Pennsylvania, Sacred Heart was subject to Pennsylvania's Workmen's Compensation Act codified at 77 P.S. §§ 1–2626 (1992 & 1997 Supp.). Being subject to the Act, Sacred Heart was obligated to pay compensation to its employees or their dependents, as the case might be, injured or killed in the course of employment. 77 P.S. § 431. Pursuant to the Act, a covered employer is obligated to insure that its employees or their dependents receive the appropriate compensation. 77 P.S. § 501(a)(1) (Supp.1997). To discharge this obligation, the employer may either obtain insurance by subscribing to the State Workmen's Insurance Fund ("SWIF"), which is a state agency, obtain insurance from a private insurance company which has been approved by the state, or, if permitted by DLI, self-insure its obligation. *Id.* Under the first option, the employer pays premiums to SWIF which in turn assumes the employer's liability for compensating injured employees. *See* 77 P.S. §§ 221, 241. The second option operates much the same way: an employer pays premiums to a state-approved private insurance company in exchange for the insurance company's assumption of the employer's liability to compensate its injured employees. SWIF and the private insurance companies compete for customers and the law's only requirement is that an employer choose one or the other. SWIF is funded like the other private insurance companies in the state—through premiums paid by its subscribers. *See* 77 P.S. §§ 241–42.

Under the third option, before being allowed to self-insure, an employer must prove to DLI that it has the "financial ability" to pay any workmen's compensation claims which may be made against it. 77 P.S. § 501(a)(1). If DLI is satisfied regarding the employer's financial ability, it may issue a certificate to the employer allowing it to self-insure against claims by workers. *Id.* A self-insured employer does not pay premiums either to SWIF or a private insurer, but pays workmen's compensation claims directly to its injured workers.

The three funds at issue in this appeal are unlike either SWIF or the private insurance companies. The funds do not make payments for the same injuries or losses which SWIF and the private insurers do. The Supersedeas Fund reimburses insurers, including self-insurers, who make compensation payments to workers who, it is later determined, are not entitled to them. 77 P.S. § 999(a). The Subsequent Injury Fund pays additional compensation to workers, who having lost an arm, leg, hand, foot, or eye in one accident, lose a second arm, leg, hand, foot, or eye in a subsequent employment-related accident. 77 P.S. § 516. The Self–Insurance Guaranty Fund pays claims to the employees of a self-insured employer when the employer has defaulted and thus failed to meet its workmen's compensation obligations to its injured employees. 77 P.S. § 1037.3.

Also, these three funds are funded differently than SWIF and the private insurance companies. Subscribers do not pay "premiums" but "assessments" by DLI. All insurers, including self-insured employers and SWIF itself, must pay assessed amounts into the Supersedeas and Subsequent Injury Funds. *See* 77 P.S. §§ 517, 999(b). The amount they must pay is determined as follows. Each year, DLI determines the amount of money spent to support these funds in the previous year. DLI then calculates the proportion of the amount of workmen's compensation paid by the particular insurer in relation to the total amount of workmen's compensation paid by all insurers.

Each insurer then must pay this percentage of the money spent the previous year. *Id.* In the case of the Self–Insurance Guaranty Fund, DLI calculates how much money will be needed to support the fund and then assesses a pro-rata amount on all self-insured employers. 77 P.S. §§ 1037.7(b)(1)–(2). After the amount of the assessment is determined by DLI, the insurer is sent a bill and must pay the amount listed in the notice within 30 days of the date of receipt. Employers insured by private insurers or SWIF do not make payments to the three funds.

Between 1990 and June, 1994, with DLI approval, Sacred Heart operated as a self-insured employer. As a self-insured employer, Sacred Heart was required to pay into the three funds in the manner detailed above. It failed to do so for the first six months of 1994, the time covered by DLI's $2,314 claim.

## II. *JURISDICTION AND STANDARD OF REVIEW*

I have jurisdiction of this appeal because in it DLI seeks reversal of a final order of the bankruptcy court. *See* 28 U.S.C. § 158(a)(1). Because the appeal involves the purely legal issue of whether the money owed to the Supersedeas, Subsequent Injury, and Self–Insurance Guaranty Funds by Sacred Heart are entitled to priority in bankruptcy, I exercise plenary review. *In re C.S. Assocs.,* 29 F.3d 903, 905 (3d Cir.1994).

## III. *LEGAL DISCUSSION*

### A. *The Definition of a Tax.*

■ Section 507(a)(7)(E)[3] provides that "excise taxes" have priority over claims made on a bankruptcy estate by other general unsecured creditors. The term "tax" is not defined in the bankruptcy code. The definition of tax for bankruptcy priority purposes is found exclusively in federal case law, although in the case of a claim by a state government for a charge or obligation created by state law, the state law determines the attributes of the government's claim. *City of New York v. Feiring,* 313 U.S. 283, 285, 61 S.Ct. 1028, 1029, 85 L.Ed. 1333 (1941).[4] Therefore, the proper analysis requires a determination whether the attributes of the state government's claim as provided by state law fit the definition of a tax articulated by the federal courts construing the federal bankruptcy law.

The United States Supreme Court defines a tax as a "pecuniary burden[] laid upon individuals or their property, regardless of their consent, for the purpose of defraying the expenses of government or of undertakings authorized by it." *Id.; see also New Jersey v. Anderson,* 203 U.S. 483, 492, 27 S.Ct. 137, 140, 51 L.Ed. 284 (1906). Following *Feiring,* several circuit and district courts have employed tests that are semantically slightly different from but substantively the same as the Supreme Court's. For example, the United States Court of Appeals for the Ninth Circuit adopted a four-part test. According to it, in order to be a tax, the government claim must be: (a) an involuntary pecuniary burden, regardless of name, imposed on individuals or property; (b) by or under authority of the legislature;

---

3. The section provides:
(a) The following expenses and claims have priority in the following order:
    *    *    *
(7) Seventh, allowed unsecured claims of governmental units, only to the extent that such claims are for—
    *    *    *
(E) an excise tax on—
(i) a transaction occurring before the date of the filing of the petition for which a return, if required, is last due, under applicable law or under any extension, after three years before the date of the filing of the petition; or
(ii) if a return is not required, a transaction occurring during the three years immediately preceding the date of the filing of the petition.

11 U.S.C. § 507(a)(7)(E) (1993).

4. The Court in *Feiring* construed a provision of an earlier version of the federal bankruptcy law. *Id.* at 284, 61 S.Ct. at 1028–29. Nonetheless, both the Supreme Court and several circuit courts have employed the definition of "tax" articulated in *Feiring* when construing the present version of the bankruptcy law. *See, e.g., United States v. Reorganized CF & I Fabricators of Utah, Inc.,* —— U.S. ——, ——, 116 S.Ct. 2106, 2113, 135 L.Ed.2d 506 (1996); *In re Suburban Motor Freight, Inc.,* 998 F.2d 338, 339 n. 2 (6th Cir.1993) ("*Suburban I*"); *New Neighborhoods, Inc. v. W. Va. Workers' Compensation Fund,* 886 F.2d 714, 718 (4th Cir.1989). For the reasons stated in those decisions, I will do the same.

(c) for public purposes, including the purposes of defraying expenses of government or undertakings authorized by it; (d) under the police or taxing power. *In re Lorber Indus. of Cal.*, 675 F.2d 1062, 1066 (9th Cir. 1982); *see also In re Adams*, 40 B.R. 545, 547 (E.D.Pa.1984) (Giles, J.) (drawing distinction between contractual obligation to state and involuntary charge assessed on all). In *In re Suburban Motor Freight, Inc.*, 36 F.3d 484 (6th Cir.1994) ("*Suburban II*"), the Sixth Circuit employed two additional factors that refine the "public purpose" prong of this test: (1) that the pecuniary obligation to the government be universally applicable to similarly situated entities; and (2) that according priority treatment to the government's claim not disadvantage private creditors with like claims. *Id.* at 488. Recently, the Ninth Circuit applied both these factors and those listed in *Lorber* to a case involving payments due a state workmen's compensation fund. *See In re Camilli*, 94 F.3d 1330, 1333 (9th Cir.1996).

▮ Both the Supreme Court's opinion in *Feiring* and the subsequent decisions by the lower courts predominantly focus on two aspects of the definition of a tax: involuntariness, i.e. that the charge is imposed regardless of the consent of the individual, *see Feiring*, 313 U.S. at 285, 61 S.Ct. at 1029, and the public purpose prong. *See Reorganized CF & I*, —— U.S. at ——, 116 S.Ct. at 2113. Attention to the involuntariness prong insures that taxes will be treated differently from obligations to governmental units assumed by individuals voluntarily. The bankruptcy system is designed to distribute the estate as equally as possible among similarly situated creditors. *See Begier v. I.R.S.*, 496 U.S. 53, 58, 110 S.Ct. 2258, 2262–63, 110 L.Ed.2d 46 (1990). Allowing a governmental unit to receive more for a claim that is the same or substantially similar to the estate's obligation to a private creditor would violate this policy. *See In re Suburban Motor Freight, Inc.*, 998 F.2d 338, 341 (6th Cir.1993) ("*Suburban I*"). Focus on the public purpose prong ensures that the claim provides support for the government generally and not for a small group or an individual.

I recently held that payments due from Sacred Heart to Pennsylvania's Unemployment Compensation Fund, *see* 43 P.S. §§ 751–914, were taxes and entitled to priority in bankruptcy because the payments satisfied the test in *Feiring* and its progeny. *See In re Sacred Heart Hosp. of Norristown*, 209 B.R. 650 (E.D.Pa.1997). In that case, the hospital had argued that unemployment compensation payments were not taxes because they were similar to premiums paid to a state-run workmen's compensation insurance fund in a system which also allowed an employer to satisfy its workmen's compensation obligation by obtaining either private insurance or self-insuring. *See In re Metro Transp. Co.*, 117 B.R. 143, 154 (Bankr. E.D.Pa.1990). I found this argument unpersuasive. Even if the payments to a state-run workmen's compensation fund in such a system were not taxes because an employer was free to seek insurance coverage from a competing private insurer, those payments were critically different from the unemployment compensation payments. Unemployment compensation payments—in contrast to workmen's compensation premiums—fit the definition of a tax because they are mandatory and there are no private entities which provide the same "service" as that provided by the state. Unemployment compensation payments also satisfy the other parts of the test because they serve a public purpose and are imposed pursuant to the state's police power.

Also instructive, although not controlling in this case, is the bankruptcy court's decision in *In re Metro Transp...* There, the court held that payments due from an employer to SWIF are not taxes because the payments do not raise revenue for the state but regulate employers' liability to their injured workers; they are not assessed on all taxpayers indiscriminately, but only on covered employers; employers may satisfy their obligation by obtaining private insurance or self-insuring, making the payments not mandatory and the system not monopolistic; and the payments benefit only a small group of individuals, injured workers, and not all citizens. *Id.* at 154. In contrast, the Fourth and Sixth Circuits have held that workmen's compensation payments due to a state-run fund are taxes

when employers are not allowed to obtain insurance from a private insurer but must subscribe to the state-run fund or self-insure. *Suburban I*, 998 F.2d at 341–42; *New Neighborhoods, Inc. v. W. Va. Workers' Compensation Fund*, 886 F.2d 714, 716 (4th Cir.1989). In *In re Pan American Paper Mills, Inc.*, 618 F.2d 159 (1st Cir.1980), the First Circuit held that worker's compensation premiums were taxes when the premiums were due to a state-run fund in a system which did not allow private or self-insurance. *Id.* at 160–61.

**B.** *The Payments Due From Sacred Heart.*

While those decisions are helpful, they are not controlling. The payments due the three funds in this case are critically different from those paid to a state-run workmen's compensation fund that competes with private and self-insurers, such as SWIF. First, even though the employer must participate in the workmen's compensation system, the payments to SWIF are not "mandatory" because an employer may choose to obtain insurance from a private insurance company. *See* 77 P.S. § 501(a)(1) (employer not required to subscribe to SWIF; it may obtain private insurance or with state approval self-insure). The obligation to pay the premiums to SWIF arises from the employer's choice, not from any statutory mandate. *See In re Camilli*, 94 F.3d at 1332; *In re Lorber*, 675 F.2d at 1067 n. 4. Second, the state does not monopolize the methods by which employers may discharge their obligations to injured workers because private and self-insurance are available. *See* 77 P.S. § 501(a)(1).[5] Finally, SWIF provides exactly the same service to employers that the employer may obtain from a private insurer elsewhere in the marketplace, giving a private entity the same claim in bankruptcy as SWIF. According SWIF priority would disadvantage other, similar creditors, the private insurance com-

panies, with similar claims. *Suburban II*, 36 F.3d at 488.[6] Payments due to SWIF, therefore, have several attributes of insurance premiums as a result of a contractual relationship between it and its subscribing employers and lack the attributes of a tax. *See In re Adams*, 40 B.R. at 547 (payments due for voluntary use of city's water and sewer system based on "implied agreement" not taxes).

■ In contrast, the payments due to the Supersedeas, Subsequent Injury, and Self–Insurance Guaranty Funds possess the attributes of a tax articulated in *Feiring* and its progeny. Essentially, the payments are a tax imposed on the act of insuring employers against workers' claims. *Cf. New Neighborhoods*, 886 F.2d at 719 (payments due to state-run workmen's compensation insurance fund are taxes imposed on employers). First, payments to these funds are mandatory. Insurers have no authority to choose not to pay them; once a private insurance company has sold workmen's compensation insurance or an employer has elected to self-insure, it must make the payments. Indeed, the statute states that payments shall be "assessed" against each insurer and employer and does not refer to "premiums" in connection with these funds. 77 P.S. §§ 517, 999(b), 1037.7(b). Second, the state monopolizes the coverage for the "losses" compensated for by these three funds; private insurers, SWIF, and self-insurers do not cover them. For that reason, there are no private entities with the same claim as the Subsequent Injury, Supersedeas, and Self–Insurance Guaranty Funds. *See In re Camilli*, 94 F.3d at 1334. Third, the payments are uniformly imposed on all similarly situated entities. All insurers must pay into the Supersedeas and Subsequent Injury Funds and all self-insurers must pay into the Self–Insurance Guaranty Fund. The hospital argues that the assessments are not imposed on all

**5.** While there is some support for Sacred Heart's argument that SWIF premiums are not uniformly assessed against all similarly situated entities because all non-self-insuring employers are not required to pay them, as I explain, *see infra* pp. 473–74, this argument fails upon close scrutiny.

**6.** SWIF even sets its premiums based on factors normally considered by private insurance companies, including the nature of the subscriber's business, the nature of the employees' employment, and the probable risk of injury to their employees, including the condition of the plant and other working conditions. 77 P.S. § 242.

similarly situated entities but only on a small group, insurers and self-insured employers. (Sacred Heart's br. at 9–10). That argument is unpersuasive as many taxes are imposed on a sub-class of taxpayers, such as those that earn income, own or purchase certain types of property, or from corporations. The exaction is no less a tax merely because it is not imposed beyond the confines of a given class. *New Neighborhoods*, 886 F.2d at 719 n. 4. Here, the payments are uniformly imposed on a subclass of taxpayers, *i.e.*, insurers in the workmen's compensation system. Fourth, the payments serve a public purpose and are revenue-raising because they place on employers the costs of supporting injured workers rather than the general public through the welfare system and are used to fund the state function of compensating injured workers and reimbursing insurers. *See United States v. New York*, 315 U.S. 510, 517, 62 S.Ct. 712, 715–16, 86 L.Ed. 998 (1942); *New Neighborhoods*, 886 F.2d at 718–19.[7] Finally, there is no dispute that the funds are collected pursuant to the legislature's police power. *See Workmen's Compensation App. Bd. v. Overmyer Mold Co.*, 473 Pa. 369, 374 A.2d 689, 691 (1977).

While this is a closer call than the unemployment compensation payments I dealt with in my previous opinion, *In re Sacred Heart Hosp. of Norristown*, 209 B.R. 650 (E.D.Pa.1997), I nonetheless conclude that the payments due the three funds in this case are taxes and entitled to priority in bankruptcy. I recognize that Sacred Heart made a "choice" to become a self-insured employer and could have chosen to avoid the payments simply by electing to obtain coverage through a private insurer or SWIF. (*See* Sacred Heart's br. at 12 n. 3). This, in one sense, would make the payments appear less like a tax because they would not be mandatory. While that argument is facially compelling, it is less so upon close scrutiny. All

taxes may be avoided by a "choice" of the taxpayer. With respect to the federal or state income tax, an individual may avoid payment of it by simply choosing not to earn any income. With respect to a tax on corporate income, an individual may avoid payment of it by electing not to form a corporation. With respect to a tobacco tax, an individual may avoid payment of it by electing not to sell or manufacture tobacco. The list goes on. Those "choices," however, are beside the point. No reasonable person would contend that those charges were not taxes. In each example, once the taxpayer has made the choice to undertake the taxed activity, a statute requires him to make the payment to the government. There is no doubt that in Pennsylvania's workmen's compensation system, even if an individual "chooses" to become a covered employer, he still does not have to make payments to SWIF. The individual can simply choose to obtain insurance from a private insurer. The statute then does not impose any tax obligation on him. However, once an insurer makes a "choice" to sell workmen's compensation insurance or an employer makes the choice to self-insure, the employer is required by statute to make payments to the three funds in this case. The critical difference is that once an entity makes this "choice," the statute imposes the obligation to pay assessments to the three funds; there is no such corresponding obligation to pay SWIF.

I also recognize that the workmen's compensation system is different than the unemployment compensation system because the workmen's compensation system was enacted, at least in part, to regulate an employer's liability for workplace injuries. That fact has led at least one court to characterize the system as regulatory and not revenue raising. *See In re Metro Transp.*, 117 B.R. at 154. In addition, the fact that the workmen's

---

7. Even the language used by the state legislature in describing Pennsylvania's workmen's compensation funds supports the inference that there are fundamental differences between SWIF and the Self–Insurance Guaranty, Subsequent Injury, and Supersedeas Funds. SWIF is described in terms commonly used when referring to insurers. SWIF's purpose is "insuring … employers against liability," 77 P.S. § 221, and payments to SWIF are called "premiums." 77 P.S. §§ 241,

242. In contrast, payments due to the three other funds are called "assessments." 77 P.S. §§ 517, 999(b), 1037.7(b). While the legislature's use of this language is not controlling, it is persuasive. *In re Adams*, 40 B.R. at 546–47; *cf. Anderson*, 203 U.S. at 491, 27 S.Ct. at 139–40 (showing deference to state court's characterization of charge created by state law, but acknowledging that federal law controls).

compensation system regulates a liability which could be insured against even in the absence of this system supports the inference that the payments are more like insurance premiums and less like taxes. Indeed, the state has stepped in to regulate employers' liability that the employers would have even if the system did not exist. Hence, because the system insures against an employer's liability to pay its workers for injuries, it looks more like a regulatory scheme than a revenue-raising tax. Unemployment compensation, by contrast, does not regulate any common-law obligation and is imposed on the taxpayer by legislative fiat. *See In re Sacred Heart Hosp. of Norristown,* 209 B.R. 650 (E.D.Pa.1997). This characteristic makes unemployment compensation look more like a tax. However, the regulation of activity and the raising of revenue are not mutually exclusive functions. Indeed, the conclusion that a tax as defined by federal law may be imposed pursuant to the state's police power, *see In re Lorber,* 675 F.2d at 1066, which is the state power typically cited as the source of authority to regulate conduct and not raise revenues, illustrates that under federal law taxes may be imposed in a regulatory system. In order to be a tax, an exaction must be revenue raising; it must defray the state's operating expenses. However, it can also regulate activity so long as it possesses the other attributes of a tax. As I previously explained the payments due the three funds possess all of the attributes of a tax, including the revenue-raising component, even though the workmen's compensation is regulatory. While the state's acting as a regulator should be considered when determining whether a charge is tax, *Feiring* and its progeny hold that possession of the attributes of a tax are controlling even if the scheme possesses characteristics of other state functions.

There is scant authority on the precise question before me. I note, however, that my conclusion is consistent with the Ninth Circuit's decision in *In re Camilli.* There, an employer covered by the state's workmen's compensation law failed to maintain workmen's compensation insurance either through the state-run fund, a private insurance company, or by self-insuring, as required by Arizona state law. When one of the employer's employees was injured, the state's "Special Fund" was forced to pay the employee's claim. The Special Fund is maintained apart from Arizona's general insurance fund (equivalent to SWIF) and pays the claims of injured worker's who are employed by employers who failed to obtain insurance coverage. The Special Fund sought priority treatment as a tax of its claim for reimbursement in the employer's bankruptcy proceeding. The court reasoned that such a claim was entitled to priority because it met the test of both *Lorber* and *Suburban II* even though Arizona law allowed an employer to obtain private insurance: the obligation arose by operation of the state statute and, therefore, was mandatory, the payments served a public purpose, and there were no private claimants with the same claim. The Special Fund is analogous to Pennsylvania's Self–Insurance Guaranty Fund because both "assess" payments against employers, both make payments apart from the general workmen's compensation fund, and payments due to both funds are imposed only on a subclass of taxpayers.

## IV. CONCLUSION

In sum, I conclude that the bankruptcy court erred in holding that amounts due to the Self–Insurance Guaranty, Supersedeas, and Subsequent Injury Funds were not entitled to priority as taxes. Hence, I will reverse the order of the bankruptcy court.