In re BELOZER FARMS, INC., Debtor.

STATE OF OREGON, OREGON FRYER COMMISSION, Appellant,

v.

ROBERT K. MORROW, INC., Trustee, Appellee.

BAP No. OR–96–1125–JHV.

Bankruptcy No. 394–31786–dds7.

United States Bankruptcy Appellate Panel of the Ninth Circuit.

Argued and Submitted May 23, 1996.

Decided Aug. 2, 1996.

Tim D. Nord, Salem, OR, for Appellant.

Jon R. Summers, Portland, OR, for Appellee.

Before: JONES, HAGAN, and VOLINN, Bankruptcy Judges.

722

## OPINION

JONES, Bankruptcy Judge:

### SUMMARY

The Oregon Fryer Commission filed a proof of claim listing its debt, which was based upon unpaid assessments, as an unsecured priority tax claim. The trustee objected. The bankruptcy court upheld the objection, ruling that the unpaid assessments were not entitled to priority because the Commission was not a "governmental entity," nor was its claim a "tax." **We AFFIRM.**

### I. FACTS

Oregon has a statutory agricultural marketing scheme. Or.Rev.Stat. tit. 47, chs. 576 *et seq.* (1995). Pursuant to that scheme, a large number of commodity commissions have been created. These commissions have been created in three different ways. First, as part of the laws which created the agricultural marketing scheme, the state legislature specifically created four commodity commissions: the Oregon Beef Council, the Oregon Sheep Commission, the Oregon Wheat Commission, and the Oregon Potato Commission. Each of these four commissions has a lengthy set of statutory guidelines dictating the reason for their creation, the qualifications and terms of their members, the duties and powers of the commission, and budgetary guidelines.

Second, the legislature enacted a statutory scheme whereby, "[a]ny 25 or more persons interested in the production of a particular commodity" could file a petition with the Oregon Department of Agriculture and request a referendum be held among the producers of that commodity on the question of whether a commodity commission should be established. Or.Rev.Stat. § 576.055(1) (1995). If the referendum results in an affirmative vote, the Oregon Department of Agriculture then holds hearings to determine if there is a need for the creation of that partic-

ular commodity commission. *Id.* §§ 576.075, 576.085. Using this process, numerous industries have successfully petitioned to have a commodity commission created, including the Chewings Fescue and Creeping Red Fescue Commission, the Oregon Clover Commission, the Oregon Processed Vegetable Commission, and the appellant herein, the Oregon Fryer Commission. All commodity commissions created in this manner are subject to general commodity commission guidelines laid out in Oregon Revised Statutes ("ORS") §§ 576.051 through 576.584. These general guidelines contain many similarities to the specific guidelines for the Beef Council and the Sheep, Wheat, and Potato commissions, but they differ in many respects as well.

Finally, the Oregon legislature created five commodity commissions—the Oregon Dairy Products Commission, the Oregon Filbert Commission, the Oregon Dungeness Crab Commission, the Oregon Salmon Commission, and the Oregon Grains Commission—stating that these commissions "shall be considered to have been created in all respects pursuant to ORS 576.051 to 576.584 and [are] vested with all the rights and liabilities of commissions created pursuant to ORS 576.051 to 576.584." *Id.* § 576.155.

Members of the fryer chicken industry in Oregon sought and obtained approval to establish a commodity commission pursuant to ORS § 576.055(1). The resulting commission—the Oregon Fryer Commission (the "Commission")—levies assessments on the initial purchaser of fryer chickens. The assessments are based upon the weight of the fryers. Debtor Belozer Farms purchases and processes fryers. From January 1993 through February 1994, Belozer Farms failed to pay its assessments. After Belozer Farms filed bankruptcy, the Commission filed a proof of claim for $42,822.78, representing the unpaid assessments.[1] The Commission characterized its claim as an unsecured priority tax debt pursuant to § 507(a)(8)(C).[2]

---

1. The original proof of claim also sought tax priority status for the penalties associated with the unpaid assessments. However, the bankruptcy court ruled that even assuming the assessments were "taxes," tax penalties are not entitled to priority status. The Commission does not appeal this ruling.

2. Unless otherwise indicated, all references to Chapters, Sections and Rules are to the Bankruptcy Code, 11 U.S.C. §§ 101, *et seq.* and to the Federal Rules of Bankruptcy Procedure, Rules 1001, *et seq.*

The bankruptcy trustee objected to the claim, arguing that it was not entitled to priority status. The bankruptcy court agreed. In its decision, the bankruptcy court ruled first that the assessments did not fit within the four-part definition of a tax as outlined in *In re Lorber Industries of California, Inc.*, 675 F.2d 1062 (9th Cir.1982). In addition, the bankruptcy court held that the fryer assessments did not satisfy the "duck" test of *In re Camilli*, 182 B.R. 247 (9th Cir. BAP 1995). Finally, the bankruptcy court held that even if the assessments were a "tax," the Commission was not a "governmental unit" and therefore its claim is not entitled to priority. The Commission appeals.

## II. ISSUES

1. Is the assessment levied on fryer purchasers by the Commission a "tax" within the meaning of § 507(a)(8)(C)?

2. Is the Commission a "governmental unit" within the meaning of § 507(a)(8)?

## III. STANDARD OF REVIEW

▮▮▮ Whether the assessments are a "tax" is a question of federal law. *Camilli*, 182 B.R. at 249. Whether an organization is a "governmental unit" within the meaning of the Bankruptcy Code is also a question of law. *In re Wade*, 948 F.2d 1122, 1123 (9th Cir.1991). We review questions of law *de novo*.

## IV. DISCUSSION

The Commission seeks priority for the unpaid assessments under § 507(a)(8)(C), which grants priority to a governmental unit's unsecured claim if that claim is "a tax required to be collected or withheld and for which the debtor is liable in whatever capacity." 11 U.S.C. § 507(a)(8)(C) (1994). The parties do not dispute that the debtor was liable for collection and payment of the fryer assessments. At issue is whether the assessments are a tax owed to a governmental unit.

**3.** Although *Lorber* was decided under § 64(a) of the Bankruptcy Act, its analysis has been adopted

### A. Are the Assessments a Tax?

▮▮▮ Whether an assessment is a tax does not turn on whether the assessment is characterized as a tax or not, "especially when the term is applied to an elaborate statutory scheme such as that created by the Bankruptcy Code." *Camilli*, 182 B.R. at 249 (citing *Union Pacific R. Co. v. Public Utility Comm'n*, 899 F.2d 854, 861 (9th Cir.1990)). Therefore, "[w]e look to federal law to determine whether a debt is a tax entitled to priority in bankruptcy." *Id.* (citing *New York v. Feiring*, 313 U.S. 283, 285, 61 S.Ct. 1028, 1029, 85 L.Ed. 1333 (1941)). The seminal case in the Ninth Circuit on what constitutes a tax .for purposes of priority in bankruptcy is *In re Lorber Industries of California, Inc.*, 675 F.2d 1062 (9th Cir. 1982).[3]

▮▮▮ As *Lorber* succinctly stated, whether or not an assessment is a fee or a tax can be a "close question." *Lorber*, 675 F.2d at 1067. In order for an assessment to be considered a tax, it must be:

(a) An involuntary pecuniary burden, regardless of name, laid upon individuals ,or property;

(b) Imposed by, or under authority of the legislature;

(c) For public purposes, including the purposes of defraying expenses of government or undertakings authorized by it;

(d) Under the police or taxing power of the state.

*Id.* at 1066.

1. *Are the Assessments an Involuntary Pecuniary Burden?*

▮▮▮ According to *Lorber*, an assessment is "involuntary" if it is "a non-contractual obligation imposed by state statute upon taxpayers who had not consented to its imposition." *Lorber*, 675 F.2d at 1066. The Commission argues that the assessment is involuntary because Belozer Farms cannot conduct its business without incurring the assessment. Belozer Farms argues that the assessment is voluntary because the fryer industry has consented to its imposition.

with respect to § 507 of the Bankruptcy Code. *Camilli*, 182 B.R. at 250.

The case in which the *Lorber* test first made its appearance was *In re Farmers Frozen Food Co.*, 221 F.Supp. 385 (N.D.Cal. 1963), aff'd, *Dungan v. Dept. of Agriculture, State of California*, 332 F.2d 793 (9th Cir. 1964), a case involving interpretation of the California Marketing Act of 1937. This act authorized the Director of the California Department of Agriculture to enter Marketing Orders for the purpose of levying assessments on agricultural commodity processors. However, before a Marketing Order could be entered, the Director had to receive the consent of a majority of that commodity's processors. In *Farmers Frozen Food*, the Director had received the consent of strawberry processors to enter a Marketing Order and levy assessments. The debtor filed bankruptcy after falling behind on the assessments. The court stated that even though a majority of the processors had to consent to entry of the Marketing Order, the assessments were nonetheless involuntary. "The distinction between a voluntary and an involuntary pecuniary burden in tax law hinges on a decision whether the nature of the particular imposition is contractual or statutory." *Id.* at 387. Under *Farmers Frozen Food*, therefore, the statutorily authorized fryer assessment would seem to be involuntary.

However, the contractual-statutory distinction in *Farmers Frozen Food* has been rejected by many courts. In *In re S.N.A. Nut Co.*, 188 B.R. 392 (Bankr.N.D.Ill.1995), the court stated that "contrary to the *Farmers Frozen Food* decision, courts under the Code have not hesitated to determine certain assessments to be 'fees,' despite the fact that they stemmed from statutory obligations." *Id.* at 395. In addition, the sewer use assessment in *Lorber*, which the Ninth Circuit held was a non-tax fee, was a statutorily-authorized assessment. *Lorber*, 675 F.2d at 1064. Therefore, the simple fact that an assessment is authorized by statute does not require a finding that it is "involuntary."

In *Lorber*, the Los Angeles County Sanitation District operated sewer lines used by both domestic and industrial users. The District funded its operations through two separate types of assessment. One assessment was made on every user—domestic or industrial—of the sewer. This assessment was based strictly upon the value of the user's property, and therefore bore no relation to how much wastewater the user actually discharged into the sewer. The District also made a second assessment against industrial users. This "surcharge" was based upon the amount of wastewater that the user discharged into the sewer. The court held that this surcharge was a fee, not a tax, because the user was free to increase or decrease the amount of discharge, thereby increasing or decreasing the surcharge.

The Sanitation District argued that the surcharge was involuntary because the user had no other practical or economic choice but to use the County sewer system. The court stated, however, that it "[was] not free to consider the practical and economic factors which constrained [the person] to make the choices it did. The focus is not upon [the person's] motivation, but on the inherent characteristics of the charges." *Lorber*, 675 F.2d at 1066. The court also noted that the first assessment was a uniform tax based upon the value of the user's property, while the surcharge was a non-uniform assessment based upon the amount of wastewater the user discharged into the sewer.

■ The fryer assessment fails the "involuntary" prong of the *Lorber* test for the following reasons. First, the assessment is imposed on people who have consented to its imposition. As noted by the bankruptcy court, the Commission was an organization created voluntarily by its members, who can elect its own members and determine the amount of the assessment, and who knew that such an organization meant that it would have to levy assessments in order to fund itself. In addition, the fryer producers can hold a referendum on discontinuing the Commission at any time after five years from the date it was created, without consent of the legislature. Or.Rev.Stat. § 576.505 (1995).

Second, under the Oregon statutory scheme, the first purchaser of a fryer is responsible for reporting and paying an assessment based upon the weight of the fryers purchased. *Id.* §§ 576.325(4), 576.335(1). This assessment is analogous to the sur-

charge in *Lorber*—which was based upon the amount the person used the sewer and which arose out of the voluntary use of the sewer— and in contrast to the first assessment in *Lorber*—which was a uniform "tax" based upon the value of the user's property.

Finally, as the court in *Lorber* noted, the practical or economic reasons as to why the person makes the choice to incur the assessment are not relevant. Therefore, the Commission's argument that Belozer Farms could not operate its business without incurring the assessment does not require a finding that the assessment is "involuntary."

### 2. *Are the Assessments Imposed By, or Under Authority of the Legislature?*

This prong is typically met, *S.N.A. Nut Co.*, 188 B.R. at 394, because most cases involve an assessment which is clearly imposed by a governmental unit. As a result, the caselaw on whether an assessment is imposed by or under the authority of the legislature is sparse.

According to Oregon law, all commodity commissions (whether created voluntarily by producers of that commodity or created by the state legislature) are excluded from the definition of "state agency." Or.Rev.Stat. § 291.050(3) (1995). In addition, for purposes of Oregon tax court jurisdiction, the section of the ORS which provides for creation of commodity commissions at the request of the producers of that commodity is not considered a "tax law" of the State of Oregon. *Id.* § 305.410.

However, the statutory scheme which provides for the creation of commodity commissions does provide some level of state control over certain of the commodity commissions' functions. For example, commodity commissions have the authority to prosecute lawsuits for collection of assessments "in the name of the State of Oregon." *Id.* § 576.305. The rules applicable to the commodity commissions when interviewing and hiring independent contractors were imposed by the Oregon Department of Administrative Services and the Oregon Department of Agriculture. Commodity commissions may also request from the Department of Administrative Services such things as supplies and equipment, printing services, accounting services, central telephone and mail services, repair and maintenance, motor vehicles, and clerical and stenographic pool services. *Id.* § 576.307. The statutory scheme provides the maximum assessment that can be levied by a commodity commission. *Id.* § 576.325(2). Finally, the budget of each commodity commission has to be filed with the Oregon Department of Agriculture and approved by its Director. *Id.* § 576.415.

On the other hand, commodity commission employees are not subject to the state personnel compensation plans established by the Oregon Department of Administrative Services. *Id.* § 576.320. Oregon has expressly disavowed any liability for the acts or omissions of the commodity commissions and their agents. *Id.* § 576.405. In addition, the assessments collected are not placed into Oregon's general fund, but are kept in accounts registered to the commodity commission and are used "only for the payment of the expenses of the commission in carrying out the powers conferred on the commission." *Id.* § 576.375. If the state provides printing services, any printing which advertises or promotes that commodity's products is not considered "state printing." *Id.* § 576.307(1)(b). Finally, commodity commissions must reimburse the state for the cost of any of the aforementioned administrative services that the state is requested to provide. *Id.* § 576.307(2).

As indicated by the Commission, the Oregon court of appeals has stated that the Oregon Sheep Commission is a "public body" and that its assessments are "public funds" (which therefore could not be donated to a political action committee). *Oregonians Against Trapping v. Oregon State Dept. of Agriculture*, 56 Or.App. 78, 81, 641 P.2d 72, 73 (Or.Ct.App.1982). However, as pointed out by the bankruptcy court, the Sheep Commission was specifically created by the state legislature under its police power for the protection of the public health and welfare. Or.Rev.Stat. § 577.705 (1995). On the other hand, the Fryer Commission was created at the request of the fryer producers and in their own interest.

There are other differences between the legislature-created commissions and the voluntarily created commissions. For example, the Director of Agriculture picks the members of the Sheep Commission. *Id.* § 577.710. By contrast, the petitioners seeking to create a commodity commission may include provisions for the election of their own members by the producers of that commodity. *Id.* § 576.055(2).

Whether or not the Commission has sufficient ties with the state government to justify a finding that its fryer assessments are imposed under the authority of the legislature is a close question. The court's reasoning in *Farmers Frozen Food* seems to dictate an affirmative answer to this question. Even the court in *S.N.A. Nut Co.*, which held that California Walnut Commission was a "trade association" whose assessments were not a tax, seemed to assume that the Walnut Commission satisfied this prong. *See S.N.A. Nut Co.*, 188 B.R. at 394. However, we need not answer this question since we hold that other elements of the *Lorber* test are not satisfied.

### 3. Are the Assessments Imposed For a Public Purpose?

■ The determination of the ultimate purpose for an assessment goes to the heart of distinguishing a "fee" from a "tax." "While a tax is an exaction for a public purpose, a fee relates to an individual privilege or benefit to the payer." *Camilli,* 182 B.R. at 253 (Jones, J., dissenting) (citing *In re Chateaugay Corp.,* 153 B.R. 632, 638 (S.D.N.Y.1993)). As stated by the U.S. Supreme Court, if the agency exacting the charge "bestows a benefit on the applicant [which is] not shared by other members of society," then the charge is a fee, not a tax. *National Cable Television Assoc. v. U.S.,* 415 U.S. 336, 340–41, 94 S.Ct. 1146, 1148–49, 39 L.Ed.2d 370 (1974). The issue, therefore, is whether the Commission uses the assessments "for the primary benefit of the payer," *S.N.A. Nut Co.,* 188 B.R. at 394, or whether the benefits of those assessments inure primarily "to the general public welfare." *In re Suburban Motor Freight, Inc. (Suburban II),* 36 F.3d 484, 489 (6th Cir.1994).

■ The Commission argues that the primary purpose of the Commission is to defray the expenses of the state in promoting and protecting the agricultural industry of Oregon. Belozer Farms argues that the primary purpose of establishing the Commission and in collecting the assessment is to enable the fryer industry to pool its resources in order to receive the benefits of joint marketing, product research, public relations, and effective lobbying. In that way, it argues, the Commission is in effect a trade association.

In creating the Beef Council, Sheep Commission, Wheat Commission, and Potato Commission, the Oregon legislature specifically stated that the purpose of these organizations is to further the public interest, health and welfare of its citizens. *See* Or. Rev.Stat. § 577.120(1) (1995) (Beef Council); *id.* § 577.705(1) (Sheep Commission); *id.* § 578.020 (Wheat Commission); *id.* § 579.020 (Potato Commission). In contrast, the decision on whether or not to allow the producers of other commodities to petition for the creation of their own commodity commission is based upon "whether or not there is need for the creation of a commission *in the interest of the general welfare of the producers of the commodity . . . .*" *Id.* § 576.085 (emphasis added).

There is no requirement in the Oregon statutory scheme that the assessments which a voluntarily organized commodity commission may impose have to be used for a public purpose. In fact, these commissions have broad authority to further their own interests, including the authority (1) to conduct research in order to "discover and develop the commercial value" of the commodity; (2) to disseminate information "showing the value of the commodity and its products for any purpose for which they may be found useful and profitable"; (3) to "represent and protect the interests of the commodity industry" with respect to state and federal tariffs, duties, trade agreements, and legislation; and (4) borrow money "so that the [commodity] responsible for the accumulation of funds may receive the benefits of the efforts for which the funds are used." *Id.* § 576.305. Under a similar statutory scheme, a court found that the California Walnut Commission was a

trade association which promoted its own interests, not the interests of the public at large.

The degree to which this assessment can be considered private is exacerbated by the activities for which the assessment is used. The assessment funds are utilized to create a common pool fund for the advertisement, marketing, and promotion of walnuts—activities which bestow a discrete, private benefit to the walnut industry.

*S.N.A. Nut Co.*, 188 B.R. at 395.

Although the Commission argues that the primary purpose of Oregon's statutory agricultural marketing scheme is to benefit the public interest, it provides no convincing support for this contention. Under the plain language of the statutory scheme, the main purpose and function of the Commission is to promote the interests of the fryer industry in Oregon. Giving the Commission priority in bankruptcy would in effect be placing the interests of the Oregon fryer industry over that of similarly situated unsecured creditors. The Sixth Circuit in *In re Suburban Motor Freight, Inc. (Suburban I)*, 998 F.2d 338 (6th Cir.1993) and *In re Suburban Motor Freight, Inc. (Suburban II)*, 36 F.3d 484 (6th Cir. 1994), held that the test for determining whether an assessment should be given priority as a tax should take into consideration whether the assessment's benefit inures "to the general public welfare," and not to someone's discrete benefit. *Suburban II*, 36 F.3d at 489; *see also Lorber*, 675 F.2d at 1066 (holding that even if an assessment is a "tax," it must also be consistent with the policy behind the priority scheme in order to receive priority). Under the Oregon statutory scheme, the primary purpose of the Commission's assessments is to benefit the interests of the fryer industry. The government connection, through budget approval and oversight, seems only to ensure that the collected assessments are not misused by the Commission.

### 4. *Are the Assessments Imposed Under Oregon's Police or Taxing Powers?*

A state has broad police powers to enact laws that are related to the "health,

safety, morals, or general welfare" of its citizens. *Lochner v. New York*, 198 U.S. 45, 53, 25 S.Ct. 539, 541, 49 L.Ed. 937 (1905); *see also Barnes v. Glen Theatre, Inc.*, 501 U.S. 560, 569, 111 S.Ct. 2456, 2462, 115 L.Ed.2d 504 (1991). States also have broad powers to impose and collect taxes in order to raise revenue. *Allegheny Pittsburgh Coal Co. v. County Comm'n of Webster County, West Virginia*, 488 U.S. 336, 344, 109 S.Ct. 633, 638, 102 L.Ed.2d 688 (1989). When creating the Beef Council and the Sheep, Wheat, and Potato commissions, the Oregon legislature stated that the commissions were being created pursuant to its police powers. Or.Rev. Stat. § 577.120(1) (1995) (The Oregon Beef Council was created pursuant to the state's authority to protect and further "the public health and welfare."); *id.* § 577.705(1) ("It is a legislative finding that the sheep industry of this state is affected with a public interest in the following respects....."); *id.* § 578.020 ("It is the purpose of this chapter, in the exercise of the police power, to promote the public health and welfare by providing the means for the protection and stabilization of the wheat industry in this state."); *id.* § 579.020 ("It is to the interest of all the people of the state that the soil resources of Oregon be developed to the fullest extent consistent with available market outlets for the products of the soil. It is also to the interest of all the people that consumers of the state be provided with an abundant supply of food of the best quality obtainable and that prices for that food are reasonable."). It is therefore unquestionable that Oregon created these four commissions under its police powers.

However, the Oregon legislature's basis for allowing the voluntary creation of other commodity commissions—like the Oregon Fryer Commission—is stated differently.

(1) After the hearings provided for in ORS 576.075, the [State Department of Agriculture] shall determine upon the facts presented and other relevant data and information available to it whether or not there is need for the creation of a commission *in the interest of the general welfare of the producers of the commodity* sufficient to

justify the holding of a referendum thereon....

....

(3) The [State Department of Agriculture's] determination of need for the creation of a commission shall be based upon a consideration of the following factors as they may be applicable to any commodity:

(a) The current market price to producers.

(b) The costs of production, including all elements of cost.

(c) Market price trends.

(d) Stability of prices.

(e) Relationship between the factors set forth in paragraphs (a), (b), (c) and (d) of this subsection.

(f) Commodity utilization and the possibility of increasing commodity utilization by research, promotive advertising, improved marketing practices, and improving time or place utility.

*Id.* § 576.085 (emphasis added). Nowhere in the voluntary commodity commission scheme does the state legislature state that these commissions will only be allowed if they act in the furtherance of the health, safety, morals, or general welfare of the state. In fact, the legislative scheme does not even mention the public welfare as a factor to be considered in deciding whether or not to allow the establishment of a commodity commission. The only interest referenced in the statute is the interest of the producers of that commodity. Although the actions of such commissions might benefit the public health, safety, and welfare, the state legislature did not base the creation of the commissions on those grounds. Based upon this, the bankruptcy court held that the Oregon Fryer Commission's assessments were not levied under Oregon's police or taxing powers.

The Commission argues that the statute allowing producers of a particular commodity to create a commodity commission was enacted for the same reasons that the specific commodity commission were created. Since the statutory guidelines for the Beef Council and the Wheat, Sheep, and Potato commissions are similar to the general guidelines for the voluntarily created commodity commis-

sions, there is some merit to this argument. However, the statute does state that the above four commissions were created under the state's police powers for the public welfare, yet states that the creation of other commissions is based upon the interests of the producers of that commodity. In addition, the legislature did not create the Fryer Commission—it merely passed a statute which allowed the Fryer Commission to be organized by, and for the benefit of, private commercial organizations. For this reason, we affirm the bankruptcy court's finding that the Fryer Commission was not created under the state's police power.

### B. Is the Oregon Fryer Commission a Governmental Unit?

The mere fact that a governmental unit makes an assessment does not mean that the assessment is automatically a "tax." *See National Cable Television Assoc.*, 415 U.S. at 340–41, 94 S.Ct. at 1148–49 (distinguishing between governmental "fees" and "taxes"). Therefore, our holding that the assessments are a fee renders moot the question of whether the Commission is a governmental unit.

### V. CONCLUSION

The bankruptcy court held that the fryer assessments are a non-tax "fee" and are not entitled to priority in bankruptcy. **We AFFIRM.**