### In re LUDLOW HOSPITAL SOCIETY, INC., Debtor.

#### Bankruptcy No. 95–40675–HJB.

United States Bankruptcy Court,
D. Massachusetts.

Dec. 30, 1997.

Richard L. Levine, Hill & Barlow, Boston, MA, for Ludlow Hospital Society, Inc.

Richard R. Erricola, Sutton, MA, Chapter 7 Trustee.

### MEMORANDUM OF DECISION

HENRY J. BOROFF, Bankruptcy Judge.

Before the Court for determination are cross motions for partial summary judgment with respect to objections filed by the Chapter 7 trustee (the "Trustee") of Ludlow Hospital Society, Inc. (the "Debtor") to claims filed by the Commonwealth of Massachusetts (the "Commonwealth") in this case.

### I. Facts and Positions of the Parties

The Debtor operated as an acute hospital[1] in Massachusetts until February 17, 1995, when it filed a voluntary petition in this court under Chapter 7 of the Bankruptcy Code. The Massachusetts Rate Setting Commission (the "Commission"), Division of Medical Security ("DMS"), and Division of Medical As-

---

**1.** Mass. Gen. Laws ch. 118F, § 2 (1988) defines an "[a]cute hospital" as "any hospital which contains a majority of medical-surgical, pedia-tric, obstetric, and maternity beds as defined by the department of public health."

sistance ("DMA") (collectively the "Agencies") have each filed proofs of claim ("Claim Nos. 7, 8, and 191"). At issue is whether certain of those claims are entitled to priority, in whole or in part, under 11 U.S.C. § 507(a)(8).

Claim No. 7, filed by the DMA, constitutes overpayments by the DMA for services rendered by the Debtor to Medicaid recipients. The parties have agreed that Claim No. 7 is an unsecured claim without priority, and its status is not at issue.

Claim No. 8, filed by the DMS, includes an alleged unsecured priority claim in the total amount of $519,298.00 (plus an unliquidated amount), related to the Massachusetts Uncompensated Care Pool (the "Pool") and the Labor Shortage Fund (the "Fund") (together the "DMS Priority Claims").[2]

Claim No. 191, filed by the Commission, asserts an unsecured priority claim in the amount of $96,645.62 (the "Commission Assessment").

The Trustee objects to the priority status of Claim Nos. 8 and 191, and moves for partial summary judgment. He asserts that the priority claims filed by the Commonwealth should be characterized as "regulatory fees," and should be treated as general unsecured debts. The Commonwealth responds with its own motion for partial summary judgment and argues that the subject claims constitute "excise taxes," and are thus entitled to priority under 11 U.S.C. § 507(a)(8)(E). After hearing the cross motions for partial summary judgment, the Court took the matter under advisement.

## II. Analysis

### A. Summary Judgment

A motion for summary judgment should be granted "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is

entitled to summary judgment as a matter of law." Fed.R.Bankr.P. 7056; Fed.R.Civ.P. 56(c); *DeNovellis v. Shalala,* 124 F.3d 298, 305 (1st Cir.1997). Both the Trustee and the Commonwealth have moved for partial summary judgment, and each claims that no genuine issue of material fact exists with respect to the priority of the Agencies' claims.

Where cross motions for summary judgment have been submitted, a court is not required to grant summary judgment as a matter of law for one side or the other side. *Heublein, Inc. v. United States,* 996 F.2d 1455, 1461 (2d Cir.1993). A court must evaluate each party's motion on its own merits, resolving factual uncertainties and drawing all reasonable inferences against the party whose motion is under consideration. *Buttitta v. City of Chicago,* 803 F.Supp. 213, 217 (N.D.Ill.1992), *aff'd,* 9 F.3d 1198 (7th Cir. 1993).

This Court agrees that no genuine issue of material fact exists with respect to the issues to be resolved herein. The issue of priority is one of law.

### B. The Claims

In Massachusetts, every hospital must obtain a license to operate from the Department of Public Health. Mass. Regs. Code tit. 105, § 130.100. To maintain a license, hospitals are required to comply with Massachusetts laws governing health facility operations. Mass. Regs. Code tit. 105, §§ 130.130(B), (D), 130.104(A)(1). Massachusetts law requires hospitals to pay amounts due on account of the Pool, the Fund, and the Commission Assessment. *Id.* As a result, each hospital must pay these monies in order to maintain its license to operate in the Commonwealth.

#### 1. The Pool

The first portion of the DMS's claim, allegedly in the amount of $469,423.00, is for the Debtor's unpaid contributions to the Pool.

---

**2.** The remainder of the DMS claim, in the amount of $173,134.00, is for compliance liability. From 1983 through 1991, the state legislature regulated the amount hospitals could charge for services. 1991 Mass. Legis. Serv. ch. 495,

§ 56 (West). Hospitals which charged more than the amounts allowed were required to pay a portion of the excess to DMS. The parties agree that the compliance liability claim is a general unsecured claim.

The Pool claim is based on Massachusetts General Laws ch. 118F, enacted as part of the Health Security Act of 1988. 1988 Mass. Legis. Serv. ch. 23, § 45 (West).[3]

Under the statute, the DMS was directed to operate an uncompensated care pool for hospitals "to more equitably distribute the burden of financing uncompensated acute hospital services across all acute hospitals." *General Hosp. Corp. v. Rate Setting Comm'n,* 407 Mass. 227, 227–28, 552 N.E.2d 113, 114 (1990) (citing 1985 Mass. Legis. Serv. ch. 574, § 12 (West), codified at Mass. Gen. Laws ch. 6A, § 75 (1969) (repealed 1988)). Uncompensated care has been defined as "free care furnished to patients by hospitals and bad debts represented by unpaid bills for patient care." *General Hosp. Corp.,* 407 Mass. at 228, 552 N.E.2d at 114. The purpose of the Pool "is to cause each acute care hospital to assume financial responsibility for a percentage of total Statewide uncompensated care equal to the percentage of total Statewide private sector care (costs for the care of patients not insured by governmental programs) provided by that hospital." *Id.* In other words, hospitals providing proportionately more uncompensated care than the average provided by hospitals in the Commonwealth would receive payments from the Pool, while those providing proportionately less free care would make payments into the Pool. *See City of Boston v. Aetna Life Ins. Co.,* 399 Mass. 569, 583 n. 16, 506 N.E.2d 106, 114 (1987) ("The costs of uncompensated care are distributed equitably among the acute care hospitals through a

system that works somewhat like an assigned risk pool.").

The Pool is funded from revenues produced by hospital assessments, federal funds, and state revenues appropriated for the purpose of the Pool. Mass. Gen. Laws ch. 118F, § 15(1) (1988). "The statute establishes a complex formula for determining a hospital's liability to the Pool and the liability of the Pool to the hospital." *Massachusetts Hosp. Ass'n. Inc. v. Dep't Of Med. Sec.,* 412 Mass. 340, 343, 588 N.E.2d 679, 682 (citing Mass. Gen. Laws ch. 118F, § 15(2), (3) (1988)). The DMS is then charged with the responsibility of collecting and distributing payments to and from the Pool according to the statutory scheme and regulations developed by the DMS. *Id.* (citing Mass. Gen. Laws ch. 118F, § 15(4) (1988)).

### 2. The Fund

The second portion of the DMS claim, allegedly in the amount of $49,875.00, is for the Debtor's liability to the Fund. The Fund was established for the purpose of addressing a perceived critical shortage of health care workers in the Commonwealth. 1988 Mass. Legis. Serv. ch. 23, § 83 (West). The money from the Fund is devoted to finance projects to train health care workers, develop career ladders within the health care professions, and establish day care programs at hospitals and other health care facilities. *Id.*

Money for the Fund is provided by an assessment on each acute care hospital, in the amount of one-tenth of one percent of gross patient service revenues[4] of each said

---

**3.** Chapter 118F was intended "to promote the accessibility of health care services for the [Commonwealth's] citizens." Mass. Gen. Laws ch. 118F, § 1 (1988). DMS was established to implement a program of insurance coverage for health care services for residents of the Commonwealth who were not otherwise eligible for or covered by a health insurance plan. *Id.* § 3; *see Mass. Hosp. Ass'n. Inc. v. Dep't of Med. Sec.,* 412 Mass. 340, 342, 588 N.E.2d 679, 681 (1992).

Mass. Gen. Laws ch. 118F, § 15 (1988), which created the Pool, was repealed and replaced by 1996 Mass. Legis. Serv. ch. 151, § 275 (West), codified at Mass. Gen. Laws ch. 118G, § 18 (1996). These two statutes are substantially identical. Under Mass. Gen. Laws ch. 118G, § 18, the Division of Health Care Finance and

Policy ("DHCFP") is responsible for operating the Pool. The DHCFP is the successor agency to the DMS and the Commission. In this case, the claim for monies due on account of the Pool and the Fund will be discussed in reference to the DMS since the DMS was in existence at the time these claims against the Debtor arose.

**4.** Mass. Gen. Laws ch. 6B, § 1 *(1991)* defines "[g]ross patient service revenue" as "the total dollar amount of a hospital's charges for services rendered in a fiscal year." Mass. Gen. Laws ch. 6B, § 1 (1991) was repealed and replaced by 1996 Mass. Legis. Serv. ch. 151, § 275 (West), codified at Mass. Gen. Laws ch. 118G, § 1 (1996). The definition of "gross patient service revenue" under Mass. Gen. Laws ch. 118G, § 1 (1996) remains unchanged.

hospital. 1988 Mass. Legis. Serv. ch. 23, § 83 (West). The money collected from this assessment is placed in a trust fund segregated from the balance of the DMS's funds. 1988 Mass. Legis. Serv. ch. 23, § 83 (West), as amended by 1989 Mass. Legis. Serv. ch. 653, § 1 (West). The DMS was given authority to administer the Fund according to regulations developed by the DMS and approved by both the Secretaries of Human Services and of Administration and Finance. *Id.*

### 3. The Commission Assessment

The Commission's alleged priority claim, in the amount of $96,645.62, arises under Mass. Gen. Laws ch. 6B, § 9 (1991).[5] Pursuant to the statute, the Commonwealth, through the Commission, annually assesses hospitals a percentage of the hospitals' approved gross patient service revenues to financially support the estimated expenses of the Commission. Mass. Gen. Laws ch. 6B, § 9 (1991).

The Commission has the authority to improve the delivery and financing of health care services in the Commonwealth by establishing rates that governmental units pay to providers of health care services. Mass. Gen. Laws ch. 6A, § 32 (1973).[6] For example, the Commission sets the rates that Medicaid providers, such as local hospitals in Massachusetts, charge for their services. *See Massachusetts Hosp. Ass'n. Inc. v. Dep't of Public Welfare*, 419 Mass. 644, 647, 646 N.E.2d 1044, 1046 (1995). The Commission also sets rates for general health supplies, rehabilitative services, and accommodations. Mass. Gen. Laws ch. 6A, § 32 (1973). Finally, the Commission acts to ensure that costs being incurred to provide health care services are reasonable and necessary to meet the public needs, and that the money is being spent efficiently and economically. *Id.*

### C. Are the Claims Taxes or Fees?

Section 507(a)(8)(E) provides:

(a) The following expenses and claims have priority in the following order:

. . . .

(8) Eighth, allowed unsecured claims of governmental units, only to the extent that such claims are for—

. . . .

(E) an excise tax on—

(i) a transaction occurring before the date of the filing of the petition for which a return, if required, is last due, under applicable law or under any extension, after three years before the date of the filing of the petition; or

(ii) if a return is not required, a transaction occurring during the three years immediately preceding the date of the filing of the petition[.]

*Id.*

The Bankruptcy Code does not define the terms "excise," "tax," or "excise tax." *United States v. Reorganized CF & I Fabricators of Utah, Inc.*, 518 U.S. 213, 219–21, 116 S.Ct. 2106, 2111, 135 L.Ed.2d 506 (1996). Nevertheless, the determination of whether a particular exaction is a "tax" within the meaning of the Bankruptcy Code is a question of federal law. *City of New York v. Feiring*, 313 U.S. 283, 285, 61 S.Ct. 1028, 1029, 85 L.Ed. 1333 (1941); *New Jersey v. Anderson*, 203 U.S. 483, 491, 27 S.Ct. 137, 139–40, 51 L.Ed. 284 (1906). A state statute's characterization of an exaction as a tax is not determinative, and the label designated by the state does not control. *Id.; see In re Park*, 212 B.R. 430, 432 (Bankr.D.Mass.1997). Rather, analysis of the exaction is necessary to determine whether it has the incidents of a

---

5. Mass. Gen. Laws ch. 6B, § 9 (1991), which created the Commission Assessment, was repealed and replaced by 1996 Mass. Legis. Serv. ch. 151, § 275 (West), codified at Mass. Gen. Laws ch. 118G, § 5 (1996). These statutes are very similar.

Under Mass. Gen. Laws ch. 118G, § 5, the assessment collected is to finance the operations of the DHCFP, the successor agency to the Commission. In this case, the claim will be discussed as the Commission Assessment since the Com-

mission was in existence at the time this claim against the Debtor arose. As noted in footnote no. 3, the DHCFP is the successor agency to both the DMS and the Commission.

6. Mass. Gen. Laws ch. 6A, § 32 (1973), which established the Commission was repealed and replaced by 1996 Mass. Legis. Serv. ch. 151, § 275 (West), codified at Mass. Gen. Laws ch. 118G, § 16 (1996).

tax within the meaning of § 507(a)(8)(E). *Reorganized CF & I Fabricators of Utah, Inc.,* 518 U.S. at 217–19, 116 S.Ct. at 2110; *New Neighborhoods, Inc. v. West Virginia Workers' Compensation Fund,* 886 F.2d 714, 718 (4th Cir.1989); *see In re Park,* 212 B.R. at 432.

In *Feiring,* the court defined taxes as "those pecuniary burdens laid upon individuals or their property, regardless of their consent, for the purpose of defraying the expense of government or of undertakings authorized by it." 313 U.S. 283, 285, 61 S.Ct. 1028, 1029, 85 L.Ed. 1333 (1941); *see In re Park,* 212 B.R. at 432. Since *Feiring,* courts have employed tests that are semantically slightly different from, but substantively identical to, the Supreme Court's definition. *Sacred Heart Hosp. v. Pennsylvania Dep't of Labor and Indus. (In re Sacred Heart Hosp.),* 209 B.R. 650, 654 (E.D.Pa.1997). The United States Court of Appeals for the Ninth Circuit has adopted a four-part test which has been widely accepted by several courts. *County Sanitation Dist. No. 2 of Los Angeles County v. Lorber Indus. of California (In re Lorber Indus. of California),* 675 F.2d 1062, 1066 (9th Cir.1982).[7] Under the test, a tax for purposes of the Bankruptcy Code consists of: (a) an involuntary pecuniary burden, regardless of name, laid upon individuals or property; (b) imposed by, or under authority of the legislature; (c) for public purposes, including the purposes of defraying expenses of government or undertakings authorized by it; (d) under the police or taxing power of the state. *Id.* The Sixth Circuit, finding the "public purpose" prong of *Lorber* too broad, refined that prong by establishing two additional criteria for characterizing a governmental assessment as a "tax." *Ohio Bureau of Workers' Compensation v. Yoder (In re Suburban Motor Freight, Inc.),* 36 F.3d 484 (6th Cir.1994)

("*Suburban II*"). That court required, first, that the pecuniary obligation to the government be universally applicable to similarly situated entities, thus ensuring that the financial exaction's burden and benefit would inure to the general public welfare and not to a discrete entity; and, second, that according priority treatment to the government's claim not disadvantage private creditors with like claims. *Id.* at 488–89; *see In re Park,* 212 B.R. at 434.

If a governmental assessment is not a "tax," then it may be a "regulatory fee." In distinguishing between a regulatory fee and a tax, the Supreme Court has held that if the agency exacting the charge "bestows a benefit on the applicant, [which is] not shared by other members of society," then the charge is a fee. *National Cable Television Ass'n. Inc. v. United States,* 415 U.S. 336, 340–41, 94 S.Ct. 1146, 1148–49, 39 L.Ed.2d 370 (1974). Similarly, courts have uniformly held that a fee, as opposed to a tax, relates to an individual privilege afforded to the payer. *United States v. River Coal Co., Inc.,* 748 F.2d 1103, 1106 (6th Cir.1984); *see Oregon v. Robert K. Morrow, Inc. (In re Belozer),* 199 B.R. 720 (9th Cir. BAP 1996) (assessments imposed by state commodity on purchaser of fryer chickens were fees since agency used assessment for the primary benefit of payer, rather than general public); *Spiers v. Ohio Dep't Natural Resources (In re Jenny Lynn Mining Co.),* 780 F.2d 585 (6th Cir.1986) (permit fee for right to engage in strip mining is not a tax), *cert. denied,* 477 U.S. 905, 106 S.Ct. 3276, 91 L.Ed.2d 566 (1986); *In re Lorber,* 675 F.2d 1062 (9th Cir.1982) (sewer and water user fees charged in amount proportionate to user's voluntary use of system are not taxes); *In re South Atlantic Packers Ass'n. Inc.,* 28 B.R. 80 (Bankr.D.S.C.1983) (poultry inspection fees are not taxes but merely

---

**7.** Although the *Lorber* test was developed for Bankruptcy Act cases, it has been employed by the Bankruptcy Appellate Panel of the Ninth Circuit under the Code. *See In re George,* 95 B.R. 718, 720 (9th Cir. BAP 1989); *aff'd,* 905 F.2d 1540 (9th Cir.1990). Thus, the test has continuing viability. *See In re Cassidy,* 983 F.2d 161 (10th Cir.1992); *Industrial Comm'n of Arizona v. Camilli (In re Camilli),* 94 F.3d 1330 (9th Cir. 1996), *cert. denied,* — U.S. —, 117 S.Ct. 953,

136 L.Ed.2d 840 (1997); *Ohio Bureau of Workers' Compensation v. Yoder (In re Suburban Motor Freight, Inc.),* 36 F.3d 484 (6th Cir.1994); *In re Park,* 212 B.R. 430 (Bankr.D.Mass.1997); *Sacred Heart Hosp. v. Pennsylvania Dep't of Labor and Indus. (In re Sacred Heart Hosp.),* 209 B.R. 650 (E.D.Pa.1997); *In re Chateaugay Corp.,* 177 B.R. 176 (S.D.N.Y.1995); *In re S.N.A. Nut Co.,* 188 B.R. 392 (Bankr.N.D.Ill.1995).

charges for voluntary governmental services).

■ Excise taxes, on the other hand, are involuntary payments imposed to serve a public purpose. *United Mine Workers of America v. Leckie Smokeless Coal Co. (In re Leckie Smokeless Coal, Co.)*, 99 F.3d 573, 583 (4th Cir.1996) (obligation imposed to "restore financial stability to coal miner's benefit plans" is a tax because it serves a public purpose and is an involuntary pecuniary burden); *River Coal Co., Inc.*, 748 F.2d at 1106 (reclamation fee imposed on strip mine operators is a tax since fee did not confer an individual benefit on the mine operator not enjoyed by the public generally); *Pan American Paper Mills, Inc.*, 618 F.2d 159, 162 (1st Cir.1980) (premiums paid under worker's compensation law are taxes because purpose is to defray governmental expense of reimbursing injured employees from accidents); *In re Sacred Heart Hosp.*, 209 B.R. at 656 (payments to state in lieu of debtor's contribution under unemployment compensation law are excise taxes because payments are used to benefit public generally).

The Trustee asserts that the above tests should not be relied upon by this Court. Instead, the Trustee argues that the proper test was enunciated by the United States Court of Appeals for the First Circuit in *San Juan Cellular Tel. Co. v. Pub. Serv. of Puerto Rico*, 967 F.2d 683 (1st Cir.1992). In *San Juan Cellular*, a case under 28 U.S.C. § 1341 (the "Tax Injunction Act"), the court held that a periodic fee due from private, but not governmentally owned providers of cellular telephone service, was a regulatory fee, rather than a tax. *San Juan Cellular*, 967 F.2d at 685. In distinguishing a "tax" from a "fee," the court recognized that a "classic 'tax' is imposed by a legislature upon many, or all, citizens [... for the purpose of] rais[ing] money, contributed to a general fund, and spent for the benefit of the entire community" while a "classic 'regulatory fee' is imposed by an agency upon those subject to its regulation ... [for] regulatory purposes ... by, for example, raising money placed in a special fund to help defray the agency's regulation-related expenses." *Id.* at 685 (citing cases). Further, the court noted:

Courts facing cases that lie near the middle of this spectrum have tended (sometimes with minor differences reflecting the different statutes at issue) to emphasize the revenue's ultimate use, asking whether it provides a general benefit to the public, of a sort often financed by a general tax, or whether it provides a more narrow benefits to regulated companies or defray's the agency's cost of regulation.

*Id.*

This Court disagrees with the Trustee's assertion that *San Juan Cellular* represents an approach different from what appears to be a well-settled line of cases commencing with *Feiring.* Notwithstanding the fact that *San Juan Cellular* was decided under the Tax Injunction Act, this Court finds the thoughts expressed by the First Circuit in *San Juan Cellular* virtually indistinguishable from those expressed by the Ninth and Sixth Circuits in *Lorber* and *Suburban II*, both decided under the Bankruptcy Code.

Therefore, this Court will apply the test set by *Lorber* as modified by *Suburban II*, as mirrored by the distinctions drawn in *San Juan Cellular*, to determine whether the assessments by the Agencies are excise taxes for bankruptcy purposes. *See Industrial Comm'n of Arizona v. Camilli (In re Camilli)*, 94 F.3d 1330 (9th Cir.1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 953, 136 L.Ed.2d 840 (1997); *Suburban II*, 36 F.3d 484; *In re Sacred Heart Hosp.*, 209 B.R. 650; *In re Park*, 212 B.R. 430; *In re Olga Coal Co.*, 194 B.R. 741 (Bankr.S.D.N.Y.1996); *In re S.N.A. Nut Co.*, 188 B.R. 392 (Bankr. N.D.Ill.1995).

**F.  Application to Present Case**

The Trustee argues that the Debtor voluntarily chose to do business as a hospital in the Commonwealth, and, as a result, privately enjoyed the benefit of the services provided by the DMS and the Commission. The Commonwealth contends that the obligation to pay fees due under the Pool, the Fund, and the Commission Assessment is mandatory and the money collected by the assessments serves a public purpose by helping to

increase the availability and quality of health-care services in the Commonwealth.[8]

■ That the assessments are imposed by the authority of the legislature and created under the police or taxing power of the state is beyond dispute. Therefore, the second and fourth prongs of the *Lorber* test are met. The first prong of the *Lorber* test (involuntariness) is met as well, since all hospitals are required to comply with the mandates of the Pool, the Fund, and the Commission Assessment. *See* Mass. Regs. Code tit. 105, §§ 130.130(B),(D), 130.104(A)(1); *see also In re Camilli*, 94 F.3d at 1333 (debtor's obligation to reimburse state for worker's compensation paid to debtor's uninsured employee was an involuntary pecuniary burden under *Lorber* because obligation to reimburse state was a statutorily created obligation); *In re Suburban Motor Freight*, 134 B.R. 617, 622 (Bankr.S.D.Ohio 1991) *aff'd*, 156 B.R. 790 (S.D.Ohio 1992) *aff'd*, 998 F.2d 338 (6th Cir. 1993) (obligation for workman's compensation premiums was involuntary under *Lorber* since assessment is mandatory and noncomplying employer is subject to a state lien); *In re Sacred Heart Hosp.*, 209 B.R. at 656 (payments to state in lieu of debtor's contribution to state unemployment compensation law was involuntary under *Lorber* since all employers must pay). Therefore, the remaining issue is whether the obligations of the Pool, the Fund, and the Commission Assessment are imposed for a public purpose or to provide a private benefit to hospitals.

**1. The Pool**

■ The Pool delivers an unmistakable benefit enjoyed by all taxpayers. Its enabling statute provided that its purpose was to "promote the accessibility of health care services for all of [the Commonwealth's] citizens, a public purpose for which public money may be expended." Mass. Gen. Laws ch. 118F, § 1 (1988) (emphasis added). As set forth by the Commonwealth, reimbursing hospitals for uncompensated care reduces the chance that people without access to health insurance will make demands on Medicaid and the Commonwealth's welfare systems, and thus all taxpayers. *See In re Sacred Heart Hosp.*, 209 B.R. at 656. Therefore, the assessments under the Pool confer a benefit to the public generally, rather than an individual benefit to an acute hospital.

Further, the assessments under the Pool satisfy the two "public purpose" factors articulated by the Sixth Circuit in *Suburban II. See In re Sacred Heart Hosp.*, 209 B.R. at 656. The obligation to the Pool is universally imposed on all acute hospitals in the Commonwealth, and there are no private creditors with claims sufficiently similar to the Agencies who would suffer any disadvantage by conferring priority treatment to a Pool claim.[9] *Id.*

In view of the foregoing, this Court finds that the money collected for the Pool is imposed for a public purpose, and as a result, the Pool claim is entitled to priority status under § 507(a)(8)(E).

---

**8.** The Commonwealth asks this Court to specifically note for support Judge Feeney's action in the case of *In re Winthrop Hospital, Inc.*, 92–14034 (Bankr.D.Mass.1995). In *Winthrop Hospital*, Judge Feeney ordered that "DMS's claims against the Debtor arising under the Uncompensated Care Pool and Labor Shortage Fund are entitled to priority under Bankruptcy Code section 507(a)(8)." Judge Feeney's ruling cannot be relied upon as precedent for this case. The *Winthrop Hospital* "decision" referred to by the Commonwealth is merely an order approving the parties' motion to compromise. As a result, *Winthrop Hospital* has no precedential value.

**9.** In a recent case decided in this district, Judge Queenan held that a claim for reimbursement of worker's compensation benefits paid by the Com-

monwealth to an injured employee of an uninsured employer did not qualify for priority status as an excise tax. *In re Park*, 212 B.R. 430 (Bankr.D.Mass.1997). The court found that in Massachusetts all employers were required to pay premiums to the workers' compensation system, but only uninsured employers were subject to reimbursement liability. *Id.* In applying the *Suburban II* criteria, the court determined that the reimbursement burden was not universally applied to similarly situated constituents, since all employers were not required to pay reimbursement claims. *Id.* Therefore, Judge Queenan found that the claim for reimbursement was not entitled to priority under the Code. This Court agrees with the result of that case.

## 2. The Fund

■ The Fund was established by 1988 Mass. Legis. Serv. ch. 23, § 83 (West), an act to make health security available to all citizens of the Commonwealth and to improve hospital financing. Although the enabling legislation states that its purpose was to address a critical labor shortage facing hospitals, there is no legislative indication as to whether the Fund was established solely to assist hospitals or whether it was also intended to serve the purpose of hiring more workers to provide health care services to the public at large.[10]

10. In 1989, section 83 creating the Fund was amended. 1989 Mass. Legis. Serv. ch. 695, § 1 (West). Among other changes, the amendment provided that the Fund "revenues shall be received impressed with a trust for the benefit of hospitals, other health care providers, and present and future health care workers." *Id.* Nevertheless, this additional language does not conclusively determine whether the Fund's purpose was solely to benefit hospitals or also to serve a benefit to the public.

11. The Trustee does not directly contest the assertions in Daley's affidavit. Rather, the Trustee requests that the Affidavit be stricken because it offers conclusions on the ultimate issue of law presented in this case. Under Rule 56(e) of the Federal Rule of Civil Procedure, an affidavit may be presented to support a motion for summary judgment. The affidavit must: (1) be made on personal knowledge, (2) set forth such facts as would be admissible in evidence, and (3) show affirmatively that the affiant is competent to testify to the matters stated therein. *Casas Office Machines, Inc. v. Mita Copystar America, Inc.*, 42 F.3d 668, 681 (1st Cir.1994); *Paton v. La Prade*, 524 F.2d 862, 871 (3d Cir.1975). A court may consider testimony that would be admissible at trial and disregard the rest. *Fidler v. Central Cooperative Bank (In re Fidler)*, 210 B.R. 411, 422 (Bankr.D.Mass.1997). Accordingly, a court must disregard an expert affidavit that is essentially conclusory and lacks specific facts. *Id.* (citing *Shaw by Strain v. Strackhouse*, 920 F.2d 1135, 1144 (3d Cir.1990)). Statements that embody conclusions will not be treated as evidencing facts to support a motion for summary judgment. *In re Farley, Inc.*, 203 B.R. 681, 683 (Bankr. N.D.Ill.1997).

With these admonitions in mind, this Court finds that the Daley Affidavit is appropriate for reliance by this Court. Daley has served as Executive Secretary of the Commission for thirty-two years. Daley Aff. ¶ 1. Daley's duties include operation of the Commission, management of its financial affairs, and fulfillment of the Commis-

■ In support of its motion for summary judgment, the Commonwealth has submitted the affidavit of John Daley, Executive Secretary of the Commission, and now its successor agency, the Division of Health Care Finance and Policy (the "Affidavit").[11] In his Affidavit, Daley details how money collected by the Pool, the Fund, and the Commission Assessment are administered to help support the Commonwealth. Daley avers that such funding improves the availability and quality of health care services, controls the cost of health insurance premiums, and allows the Agencies to operate and assist in the formulation of health care policy in the Commonwealth. Daley Aff. ¶ 15. Daley's

sion's statutorily mandated programs. Daley Aff. ¶ 2. The staff under Daley's direction are responsible for processing funds received and expenditures made at the agency level, and for administering funds, including the Fund and the Pool, in conformance with applicable law. *Id.* Therefore, it is indisputable that Daley's affidavit is based on his personal knowledge and that he is competent to testify to the issues stated herein.

The assertion that Daley's affidavit is conclusory is itself not convincing. The facts averred to by Daley attempt to explain the purpose behind the statutory programs the agency is responsible for administering. A court should defer to an agency's expertise so long as its averment is supported by substantial evidence and is reasonable. *See Northeast Utilities Serv. Co. v. Fed. Energy Regulatory Comm'n*, 993 F.2d 937, 944 (1st Cir.1993); *see also Chevron USA v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 844, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984). It is well-settled that considerable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer. *See Chevron U.S.A. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 844, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984). Moreover, an agency's interpretation should be deferred to whenever a decision as to the meaning and reach of a statute involves reconciling conflicting policies, and a full understanding of the force of the statutory policy depends upon more ordinary knowledge respecting the matters subjected to agency regulation. *Id.* But see *In re J.F.D. Enterprises, Inc.*, 183 B.R. 342, 349–51 (Bankr.D.Mass.1995) (where the surrounding circumstances mandated the opposite conclusion).

The facts averred to by Daley are consistent with the underlying statute. Moreover, Daley does not attempt to give a legal analysis or conclude that the governmental assessments at issue are excise taxes. Therefore, Daley's affidavit cannot be said to decide the law and may be relied upon by the Agencies to support its motion for summary judgment.

Affidavit further defines certain problems that have been and would be encountered by the Commonwealth without the collection of such monies, including increases in the cost of health care, lack of trained health care workers, and an increase in the spread of disease. Daley Aff. ¶ 10.

In Daley's affidavit, he avers that in the late 1980's, there was a shortage of trained health care workers in the Commonwealth. Daley Aff. ¶ 4. That shortage increased the cost of health care, and therefore health insurance premiums, by driving up wages for health care workers, and by requiring hospitals to expend money recruiting employees from places outside the Commonwealth. *Id.* The higher cost of health care was particularly felt by the Commonwealth because it is the largest employer in the state and because it funds the Medicaid program which provides health care to low-income persons. *Id.* Daley avers that the increased costs also impaired the public's ability to obtain access to such health care by delaying hospital admissions and even out-patient care due to the shortage of hospital personnel. *Id.*

An increase in health care workers serves a benefit not only to the hospitals but to the public generally. The health care industry by its very nature promotes a public purpose by ensuring that all citizens gain access to health care. Moreover, the Court determines it reasonable to find, as Daley avers, that a shortage of qualified workers limits the public's access to health care services and increases the costs to the Commonwealth to fund public health services. The money collected from the Fund, therefore, serves a public purpose in defraying the costs the Commonwealth would be required to spend to provide health care services to its residents.

Further, the Fund satisfies the requirements of *Suburban II.* First, the obligation is universally imposed on all acute hospitals in the Commonwealth. *See In re Sacred Heart Hosp.,* 209 B.R. at 656. Second, granting priority to the Commonwealth's claim under the Fund does not disadvantage private creditors since there are no private

creditors with claims sufficiently similar to that of the Agencies. *Id.*

In view of the foregoing, this Court finds that the money collected for the Fund is imposed for a public purpose, and as a result, the Fund claim is entitled to priority status under § 507(a)(8)(E).

### 3. The Commission Assessment

■■■■ The Commission Assessment is different in character from the Pool claim and the Fund claim. The purpose of the assessment was to pay the expenses of the Commission, whose primary function is rate-setting.[12]

Several courts have held that where an exaction is imposed to fund a regulating government agency, the public purpose element is not met if the benefit conferred by the agency is not generally shared. For example, in *In re Jenny Lynn Mining,* 780 F.2d 585, 589 (6th Cir.1986), the Sixth Circuit determined that a "permit fee" did not involve a "public benefit" despite the fact that a portion of the funds were used to fund a regulating government agency. *Id.* at 589. The court stated that "one purpose of most governmentally imposed fees is to support the agency that administers the program under which the fee is charged, presumably serving some public purpose. If this were the deciding factor, all such fees would be 'taxes' for bankruptcy purposes." *Id.*

Similarly, in *In re S.N.A. Nut Co.,* 188 B.R. 392, the court found that the California Walnut Commission, although a governmental agency, was like a trade association which promoted its own interests, and not the interests of the public at large. *In re S.N.A. Nut Co.,* 188 B.R. at 396. The Commission was established by the Legislature to maintain and expand the walnut industry in California, and to provide information to the public regarding the beneficial qualities of walnuts, and the production and distribution costs necessary to make them available. *Id.* at 392. The court determined that the assessments imposed on the walnut producers to defray the costs of operating the commission

12. In addition to setting rates, the Commission also "collects, analyzes and disseminates health

care data to assist in the formation of health care policy." Daley Aff. ¶ 15.

clearly served a private purpose. The court found that "[t]he assessment funds are utilized to create a common pool fund for the advertisement, marketing, and promotion of walnuts—activities which bestow a discrete, private benefit to the walnut industry." *Id.* at 395; *see also In re Belozer Farms, Inc.,* 199 B.R. at 726 (assessments imposed on debtor by state fryer commission were collected in the interest of the general welfare of the producers of the commodity, not the interests of the public).

This Court finds the Commission different in character from bodies which have regulated primarily private enterprises and only incidentally promoted the public interest. As the First Circuit noted in *San Juan Cellular,* not all assessments can be neatly categorized as a "classic tax" or a "classic regulatory fee." *San Juan Cellular,* 967 F.2d at 684. In this case, with the authority to set rates that governmental units pay to the providers of health care services, the Commission plays an important role with respect to the delivery and financing of health care services for all citizens. Notwithstanding the assessment's overriding purpose to "defray the agency's cost of regulation," *Id.,* the regulation itself promotes the public interest.

And finally, as with the Pool and Fund claims, the Commission Assessment satisfies the requirements of *Suburban II.* First, the obligation is universally imposed on all acute hospitals in the Commonwealth. *See In re Sacred Heart Hosp.,* 209 B.R. at 656. Second, granting priority to the Commonwealth's claim under the Fund does not disadvantage private creditors since there are no private creditors with claims sufficiently similar to that of the Agencies. *Id.*

In view of the foregoing, this Court finds that the Commission Assessment is imposed for a public purpose, and, as a result, the Commission claim is entitled to priority status under § 507(a)(8)(E).

III.   Conclusion

Based on the foregoing analysis, this Court finds and rules that each of the Pool, Fund and Commission claims, in such amounts as this Court shall ultimately allow, are entitled to priority status under § 507(a)(8)(E).  Ac-

cordingly, the Commonwealth's motion for partial summary judgment is allowed and the Trustee's motion for partial summary judgment is denied.  An order will be issued in conformity herewith.